## The United States District Court
## For the Northern District of Ohio
## Western Division  (Toledo)

Katina L. Duran                                  Amendment **To Lawsuit**
7346 Hill Ave
Holland, Ohio 43528                              R.I.C.O. Act/Fraud
                                                 Rescission / TILA Act
                                                 Contract Fraud

Plaintiff

                                                 Case Number 3:12-cv-1801
vs-                                              Judge: Jeffrey J. Helmick


Defendants

Bank of America Lp Servicing, c/o Serena Harman
400 Countrywide Way
 Simi Valley, CA 93065

and Bank of America N.A.
7105 Corporate Dr
Plano, Tx 75024

Third Party's,   Defendants

Teresa L. Bese, Notary
2101 Bradbant Dr
Plano, Tx 75025-0000

Mortgage Electronic Registration Systems   Defendants
1595 Springhill Rd. Suite 310
Vienna, Virginia 22182

Erla Carter Shaw   Defendants:
Five Brothers Default Management Solutions c/o Erla Carter Shaw
14200 East 11 Mile Rd. Warren, MI 48089

Serena Harman
BAC / Countrywide
7105 Corporate Dr. Plano, Tx 75024

Jeffrey Laurito, Defendants
35 Commercial Way
Springboro, Ohio 450666

Nicholas Cardinal  Defendants
24755 Chagrin Blvd. Ste 200
Cleveland, Ohio 44122

McGlinchey Stafford, PLLC
James Sandy Atty. 0084246
25550 Chagrin Blvd. Ste. 406
Clevelnad, Ohio 44122

Bank Of America has two claims against me for foreclosure in each company. Bank Of America Lp Servicing is located at 400 Countrywide Way Simi Valley, Ca 93065, and Bank Of America N.A. Is located at 7105 Corporate Dr. Plano, Tx 75024.

Defendant Mers Corp is a Delaware Corporation who examines proof of Claims, and Stay Injunctions to a Bankruptcy, and Banks work through them to assign notes.

Teresa Bese is a Notary in the state of Texas, not Ohio. Pursant to the Ohio Laws, Notaries have to meet certain critereas to become lawful, and  is held under oath to pleadge good faith in contracts.

Serena Harman, claimed to work as an Assistant Vice Preseident of Taylor Bean and Whitaker Corp. at that time she signed the transfer, Taylor Bean and Whitaker was in a bankruptcy, and ceased from any more breach of contracts, to stop any mortgage transactions in August of 2009. My fraudulent transfer took  place.  Place upon the robo signers in question in December of 2009 of the assignment. Erla Carter Shaw's, stamped signature shows fraud. Then Jeffrey Laurito went under Oath claiming the same, as Teresa Bese notarized allegations, and misrpresentations to my contract of the assignment. Nicholas Chagrin filed the suit in Common Pleas of Toledo in 2012, and filed loan documents without my FHA case number in turn it has been REDACTED, not in tact. As you see the loan numbers are whited out., and  any facts are concealed, this is all very pertinent to my case pleadings.

1.)The Banks claim they are the successor and holder of my note. My address is located at 7346 Hill Ave Holland, Ohio 43528.  When Taylor Bean and Whitaker was shut down for fraud and put into a Federal Court of Florida, I rescinded my loan with Taylor Bean and Whitaker and Bank Of America.

Both of these banks violated the Truth and Lending Act, including Taylor Bean and Whitaker.

12 U.S.C. 1635, and implementing Federal Reserve Board Regulation Z, 12 C. F.R. 226.

The Truth in Lending Disclosure Statement Regulation  Z reads in pertinent part. 226.18

For each transaction , the creditor shall disclose the following information as applicable.

a.) Payment schedule, The number, Amounts, and Timing of payments scheduled to repay the

obligation.

b.) Consumers Right To Rescind.

1). In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be  subject to the security interest shall have the right to rescind  the transaction, except for transactions described in paragraph (f) of this section.

(2) To excersise this right to resind the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

3)  The consumer may exercise the right to rescind until midnight of the third business following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of material disclosures, whichever occurs last. If the required notice of material is not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in property, whichever occurs first. In the case of certain administration proceedings, the rescission period shall be extended with Section 125 (f) of the Act.

C.) Notice of Right to Rescind

1.) In a transaction subject to rescission, a creditor shall deliver two copies of the notice to each consumer entitled to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in section 226.36 (b). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following.
2.) The retention or acquisition so a security intent in the consumers principal dwelling.
3.) The Consumers right to rescind the transaction.

4.) How to exercise the right to rescind, with a form for that purpose designating the address of the creditors place of business.

5.) The effects of the rescission, as described in paragraphs (d) of this section.

6.) The date the rescission period expires.


d). Effects Of Rescission.

1.     When a consumer rescinds a transaction the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount including any finance charge.

2.     Within 20 calendar days after receipt of notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

3.   If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met it's obligation under paragraph (d) (2) of this section. When a creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender it's reasonable value. At the consumers option, tender of property may be made at the location of the property or at the consumers residence. Tender of money must be made at a creditors designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumers tender, the consumer may keep it without further obligation.



TILA Provides in Pertinent Part

15 U.S.C. 1640

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this sub chapter with respect to any person liable to such person in an amount equal to the sum of -



1)   any actual damage sustained by such person as a result of the failure.

2)   In the case of an individual action relating to a credit transaction not under an open line credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4000.

3)   In the case of any successful action to enforce the foregoing liability or in any action which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney fee's as determined by the court.

Verified Complaints

I only received one copy of the Notice or Right to Cancel in connection with Taylor Bean and Whitaker

Mortgages payments were not being accounted for, and  were misplaced, my escrow was stolen, as well

In August of 2009 Taylor bean and Whitaker was shut down, and filed for bankruptcy in Federal Court

of Florida in the Jacksonville Middle District. I filed claim forms, stating my claims, and proved my

evidence of fraud within my loan. My case number in Federal Court I am stayed to on behalf of Taylor

Bean and Whitaker  in the Plan Of Confirmation. Case number 3:09-bk-7047-JAF Doc 3420.

Under bankruptcy Rules 363 and 362 violations from Bank Of America occurred due to filing of two

foreclosures back in 2010 and present. See exhibit D from Judge Funk in the Middle District Of

Florida's Bankruptcy case in reference to Taylor Bean and Whitaker, motion conforms to hold Katina

bound to The Confirmed Plan Of Liquidation. It reads on last page of the motion filed in July 2012.

That The Court additionally noted that the Confirmed Plan of Liquidation, by plaintiffs ( including

Katina Duran) are bound, provides that any person (or entity) injured by any willful violation of the

injunction, supra, may recover damages, including costs and attorney fees, and in appropriate

circumstances, may recover punitive damages from the willful violator.   A motion of relief was not

presented into the court in Federal Florida's jurisdiction to this matter in his court. Deliberate causing

undue stress, and aggravation, and loss of work to file pleadings.


RICO PERSONS


The parties in concert to the R.I.C.O Violations, on verified complaints. For one identifying the forged

foreclosure assignments in question under Federal Statute, SEC, FBI investigations, and IRS, Supreme

Court of Justice, and OTS. To my understanding of the color of law, a  Mortgage Assignment in Ohio

signed by a Notary in Texas is against the law. On exhibits presented in the first foreclosure complaints

shows just this. Serena Harman, is notarizing an instrument to be acting as a Sole Nominee, and Vice

President of Taylor Bean and Whitaker Mortgage. This can't be, because Taylor Bean and Whitaker was

shut down, and filed a bankruptcy in August of 2009. This instrument is dated December 2009, after

the fact.  See exhibits of the Notaries and the commissioned States they live in. Ohio Revised Code Sec

147.01, 147.02, 147.03 gives meaning to the Powers of Notaries.

1. A Notary Public Shall have power throughout the state for which hi is appointed.
2. To Take and certify to acknowledgments of deeds, mortgages, liens, powers of attorney and other instruments of writing
3. To take and certify depositions
4. To receive make and record notarial protests.

As a public Officer, the Notary Public is liable, personally, to any person who suffers damage because

of his negligence, malice, or corruption. This may result in a suit for damages being filed in court by

the injured party and possible judgment against the notary.   See ex F Ohio Guidebook for Notaries

Serena Harman was being sued as a robo signer, and was previously employed at Countrywide

Mortgage Company,  you can find the information if your Google her name as well.

Another notary appears to be Theresa Bese and also lives in Texas as Serena Harman. Robo Signing

documents is illegal, and causes for damages, and injury where the burden of proof was recognized

by a long time harassment by Bank Of America and the co conspirators of manipulation of assignment.


Misrepresentation of Facts


Then to further look at my foreclosure papers, the loan #'s are whited out, my FHA case number  as

well in my second filing Bank Of America filed on me in Lucas County Common Pleas Court.

Now we also have Erla Carter Shaw who claimed to work for Taylor Bean and Whitaker, who stamped

or someone stamped her name, as "Pay to the recourse to Taylor Bean and Whitaker.""Erla Carter

Shaw". When in fact at the time Taylor Bean and Whitaker was closed up and was ceased from doing

**any** mortgage related  practices. We have Jeffrey Laurito, the Attorney for Bank Of America in my

first foreclosure verifying the misrepresentations, and fraud on my assignment.  Under bankruptcy rules

of Federal code 363, and 362.


As to Mers regulations, the Mortgage Electronic Registrations.

They are required to get a relief from Stay when in fact there is a bankruptcy filed, it has to be

Also any proof of claims made, (creditors,) done through the bankruptcy court for an assignment to get

executed. by decpetion of the creditor/borrower. Exhibit G, the Mers reguations.


## The Nature Of The Actions

1.   This action for triple damages cost and attorney fees under the 18 U.S.C. 1946 Code
of the Federal Racketeer Influence and Corrupt Organization Act (RICO), 18 U.S.C 1961-1968
arising out of an ongoing pattern of mortgage fraud being conducted by the defendants.


## Jurisdiction and Venue

This court has original jurisdiction to hear plaintiffs Civil Rico Act claim under 1964 in accordance

with the decision of the United Supreme Court in Tafflin V. Levitt 493 U. S. 455 (1990).


Defendants, Bank of America Lp, Servicing, and Bank Of America N.A. Claims they are the successor

in interest to the party identified as the lender in the promissory note and mortgage date. As well as

Defendant fraudulently misrepresented the vaule, the assignment and misrepresented the loan to value,

conducted a pattern of more racketeering activity.  When an inflated appraisal takes place, it's a

fraud based on what the county auditor's website say's it's actually worth. Under an injury discovery rule an action accrues on the earlier of the date in which the actionable injury in fact is discovered or should have been discovered by excersice of reasonable diligence. The accrual date triggers the period of limitations, which is four years from the date the plaintiff knew he or she was injured, another words, the statute of limitations is suspended or "tooled" until the plaintiff knows that he or she has an actionable injury in fact, and then has four years to file suit.

Plaintiffs actual injury in fact accrued in and around 2009. Bank Of America has already taken advantage of me, has mislead me to get  into a HAMP program, in 2009. After taking my down payment to start a new beginning, they failed to keep there word. I never got my new loan package, but they did  hold, and cashed  a  check form me for a modification they said I was once approved for.

### Injury by Fraud and Deception

 The calls were non stop around September 2009 to early part of Feb. 2009. I then asked them, and questioned my payment history, and filed a formal letter, filing a rescission for breach of contract. Provided  in my TILA disclosure, and RESPA Act.  The statements Bac Group was sending were over what I was originally paying, by over $100.00 a month.  In 2012, I find the Ocala Loans that we're transferred to Bank Of America, and my loan was not one of them. This is why my loans numbers were whited out apparently.  The case is located again at www.bmcgroup.com In a U..S. Federal Court  of Jacksonville, Florida, see Taylor Bean and Whitaker. Where I am Bound to the Plan Of Confirmation.

 The Lucas County Auditor appraised my home to a value of not more than $113,900 in 2009. See exhibit H. Bank Of America refused to justify the new county appraisal, and reduce the principal. When a party is induced by a fraudulent misrepresentation to enter into a contract the party must elect to enter to either 1. Affirm the contract and recover damages in tort for the fraud., Or 2. disaffirm the contract and recover the consideration with which he has parted. H.C. Hanson v Am. Nat'l Bank and

Trust Co. 865 S. W. 2d 302, 306. (Ky.1993). The election required is the available remedies- either affirming the contract and claiming damages or rescinding the contract. Sanford Const. Co. V' S &H. See Rotella, 528 U.S. 549, 552, 53, 120 S. CT. 1075, 145, Led, 2d 1047 (2000)

## SENATE REPORT NO. 95-989

This section governs the means by which creditors and equity security holders present their claims or interests to the court. Subsection (a) permits a creditor to file a proof of claim or interest. An indenture trustee representing creditors may file a proof of claim on behalf of the creditors he represents.

This subsection is permissive only, and does not require filing of a proof of claim by any creditor. It permits filing where some purpose would be served, such as where a claim that appears on a list filed under proposed 11 U.S.C. 924 or 1111 was incorrectly stated or listed as disputed, contingent, or unliquidated, where a creditor with a lien is undersecured and asserts a claim for the balance of the debt owed him (his unsecured claim, as determined

under proposed 11 U.S.C. 506(a)), or in a liquidation case where
there will be a distribution of assets to the holders of allowed
claims. In other instances, such as in no-asset liquidation cases,
in situations where a secured creditor does not assert any claim
against the estate and a determination of his claim is not made
under proposed 11 U.S.C. 506, or in situations where the claim

asserted would be subordinated and the creditor would not recover
from the estate in any event, filing of a proof of claim may simply
not be necessary. The Rules of Bankruptcy Procedure and practice
under the law will guide creditors as to when filing is necessary
and when it may be dispensed with. In general, however, unless a
claim is listed in a chapter 9 or chapter 11 case and allowed as a
result of the list, a proof of claim will be a prerequisite to
allowance for unsecured claims, including priority claims and the
unsecured portion of a claim asserted by the holder of a lien.

The Rules of Bankruptcy Procedure will set the time limits, the
form, and the procedure for filing, which will determine whether
claims are timely or tardily filed. The rules governing time limits
for filing proofs of claims will continue to apply under section
405(d) of the bill. These provide a 6-month-bar date for the filing
of tax claims.

Subsection (b) permits a co debtor, surety, or guarantor to file a
proof of claim on behalf of the creditor to which he is liable if
the creditor does not timely file a proof of claim.

In liquidation and individual repayment plan cases, the trustee
or the debtor may file a proof of claim under subsection (c) if the
creditor does not timely file. The purpose of this subsection is
mainly to protect the debtor if the creditor's claim is
nondischargeable. If the creditor does not file, there would be no
distribution on the claim, and the debtor would have a greater debt

to repay after the case is closed than if the claim were paid in part or in full in the case or under the plan.

Subsection (d) governs the filing of claims of the kind specified in subsections (f), (g), (h), (i), or (j) of proposed 11 U.S.C. 502. The separation of this provision from the other claim-filing provisions in this section is intended to indicate that claims of the kind specified, which do not become fixed or do not arise until after the commencement of the case, must be treated differently for filing purposes such as the bar date for filing claims. The rules will provide for later filing of claims of these kinds.

Subsection (e) gives governmental units (including tax authorities) at least six months following the date for the first meeting of creditors in a chapter 7 or chapter 13 case within which to file proof of claims.

AMENDMENTS

2005 - Subsec. (e). Pub. L. 109-8 added subsec. (e).
1984 - Subsec. (d). Pub. L. 98-353 inserted "502(e)(2),".

-CITE-
    11 USC Sec. 548                        01/03/2012 (112-90)

-EXPCITE-
    TITLE 11 - BANKRUPTCY
    CHAPTER 5 - CREDITORS, THE DEBTOR, AND THE ESTATE
    SUBCHAPTER III - THE ESTATE

-HEAD-
        Sec. 548. Fraudulent transfers and obligations

-STATUTE-

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily -

   (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

   (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
   (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
   (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
   (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
   (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of

business.

(b)  The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

(c)  Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(d)(1)  For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the

transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

(2)  In this section -

(A)  "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

(B)  a commodity broker, forward contract merchant, stockbroker,

financial institution, financial participant, or securities
clearing agency that receives a margin payment, as defined in
section 101, 741, or 761 of this title, or settlement payment, as
defined in section 101 or 741 of this title, takes for value to
the extent of such payment;

(C) a repo participant or financial participant that receives a
margin payment, as defined in section 741 or 761 of this title,
or settlement payment, as defined in section 741 of this title,
in connection with a repurchase agreement, takes for value to the
extent of such payment;

(D) a swap participant or financial participant that receives a
transfer in connection with a swap agreement takes for value to
the extent of such transfer; and

(E) a master netting agreement participant that receives a
transfer in connection with a master netting agreement or any
individual contract covered thereby takes for value to the extent
of such transfer, except that, with respect to a transfer under
any individual contract covered thereby, to the extent that such
master netting agreement participant otherwise did not take (or
is otherwise not deemed to have taken) such transfer for value.

(3) In this section, the term "charitable contribution" means a
charitable contribution, as that term is defined in section 170(c)
of the Internal Revenue Code of 1986, if that contribution –

(A) is made by a natural person; and

(B) consists of –

(i) a financial instrument (as that term is defined in
section 731(c)(2)(C) of the Internal Revenue Code of 1986); or

(ii) cash.

(4) In this section, the term "qualified religious or charitable
entity or organization" means –

(A) an entity described in section 170(c)(1) of the Internal Revenue Code of 1986; or

(B) an entity or organization described in section 170(c)(2) of the Internal Revenue Code of 1986.

(e)(1) In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if -

(A) such transfer was made to a self-settled trust or similar device;

(B) such transfer was by the debtor;

(C) the debtor is a beneficiary of such trust or similar device; and

(D) the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

(2) For the purposes of this subsection, a transfer includes a transfer made in anticipation of any money judgment, settlement, civil penalty, equitable order, or criminal fine incurred by, or which the debtor believed would be incurred by -

(A) any violation of the securities laws (as defined in section

3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C.

78c(a)(47))), any State securities laws, or any regulation or

order issued under Federal securities laws or State securities

laws; and

Fraud by Deception/ Tort Claim

(B) fraud, deceit, or manipulation in a fiduciary capacity or

in connection with the purchase or sale of any security

registered under section 12 or 15(d) of the Securities Exchange

Act of 1934 (15 U.S.C. 78l and 78o(d)) or under section 6 of the

Securities Act of 1933 (15 U.S.C. 77f).

-SOURCE-
     (Pub. L. 95-598, Nov. 6, 1978, 92 Stat. 2600; Pub. L. 97-222, Sec.
     5, July 27, 1982, 96 Stat. 236; Pub. L. 98-353, title III, Secs.
     394, 463, July 10, 1984, 98 Stat. 365, 378; Pub. L. 99-554, title
     II, Sec. 283(n), Oct. 27, 1986, 100 Stat. 3117; Pub. L. 101-311,
     title I, Sec. 104, title II, Sec. 204, June 25, 1990, 104 Stat.
     268, 269; Pub. L. 103-394, title V, Sec. 501(b)(5), Oct. 22, 1994,
     108 Stat. 4142; Pub. L. 105-183, Secs. 2, 3(a), June 19, 1998, 112
     Stat. 517; Pub. L. 109-8, title IX, Sec. 907(f), (o)(4)-(6), title
     XIV, Sec. 1402, Apr. 20, 2005, 119 Stat. 177, 182, 214.)

     See Civil Securities and Exchange Commission Vs Bank Of America Case Number

     08CIV 5170 (S.D. N.Y)

     See Exhibit, and case No. 1:10-cv-00667 (E.D.V.A.) SEC Vs Farka's.

This is very relevant to my case proceeding, as the fraud keeps growing, and

prosecutions are still set for trials, as investigations to the fraud stems

from the R.I.C.O Act, The Federal Racketeer Influenced and Corrput Organization.

SENATE REPORT NO. 95-989

This section is derived in large part from section 67d of the Bankruptcy Act [section 107(d) of former title 11]. It permits the trustee to avoid transfers by the debtor in fraud of his creditors. Its history dates from the statute of 13 Eliz. c. 5 (1570).

The trustee may avoid fraudulent transfers or obligations if made with actual intent to hinder, delay, or defraud a past or future creditor. Transfers made for less than a reasonably equivalent consideration are also vulnerable if the debtor was or thereby becomes insolvent, was engaged in business with an unreasonably small capital, or intended to incur debts that would be beyond his ability to repay.

The trustee of a partnership debtor may avoid any transfer of partnership property to a partner in the debtor if the debtor was or thereby became insolvent.

If a transferee's only liability to the trustee is under this section, and if he takes for value and in good faith, then subsection (c) grants him a lien on the property transferred, or other similar protection.


Subsection (d) specifies that for the purposes of fraudulent transfer section, a transfer is made when it is valid against a subsequent bona fide purchaser. If not made before the commencement of the case, it is considered made immediately before then.


Subsection (d) also defines "value" to mean property, or the satisfaction or securing of a present or antecedent debt, but does

not include an unperformed promise to furnish support to the debtor
or a relative of the debtor.

-REFTEXT-
                        REFERENCES IN TEXT
    Sections 170(c) and 731(c)(2)(C) of the Internal Revenue Code of
1986, referred to in subsec. (d)(3), (4), are classified to
sections 170(c) and 731(c)(2)(C), respectively, of Title 26,
Internal Revenue Code.

## INJURY

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961-1968, which is directed at "racketeering activity" - defined in 1961(1) to encompass, inter alia, acts "indictable" under specific federal criminal provisions, including mail and wire fraud - provides in 1964(c) for a private civil action to recover treble damages by any person injured in his business or property "by reason of a violation of section 1962." Section 1962(c) prohibits conducting or participating in the conduct of an enterprise "through a pattern of racketeering activity." Petitioner corporation, which had entered into a joint business venture with respondent company and which believed that it was being cheated by alleged overbilling, filed suit in Federal District Court, asserting, inter alia, RICO claims against respondent company and two of its officers (also respondents) under 1964(c) for alleged violations of 1962(c), based on predicate acts of mail and wire fraud. The court dismissed the RICO counts for failure to state a claim. The Court of Appeals affirmed, holding that under 1964(c) a RICO plaintiff must allege a "racketeering injury" - an injury "caused by an activity which RICO was designed to deter," not just an injury occurring as a result of the predicate acts themselves - and that the complaint was also defective for not alleging that respondents had been convicted of the predicate acts of mail and wire fraud, or of a RICO violation.

*Held:*

> 1. There is no requirement that a private action under 1964(c) can proceed only against a defendant who has already been convicted of a predicate act or of a RICO violation. A prior-conviction requirement is not supported by RICO's history, its language, or considerations of policy. To the contrary, every indication is that no such requirement exists. Accordingly, the fact that respondents have not been convicted under RICO or the federal mail and wire fraud statutes does not bar petitioner's action. Pp. 488-493.

> 2. Nor is there any requirement that in order to maintain a private action under 1964(c) the plaintiff must establish a "racketeering injury," not merely an injury resulting from the predicate acts themselves. A reading of the statute belies any "racketeering injury" requirement. If the defendant engages in a pattern of racketeering activity in a manner [473 U.S. 479, 480] forbidden by 1962, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement. Where the plaintiff alleges each element of a violation of 1962, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Pp. 493-500.

741 F.2d 482, reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and POWELL, JJ., joined, post, p. 500. POWELL, J., filed a dissenting opinion, post, p. 523.

Franklyn H. Snitow argued the cause for petitioner. With him on the brief was William H. Pauley III.

Richard Eisenberg argued the cause for respondents. With him on the brief were Alfred Weintraub and Joel I. Klein. *

[ Footnote * ] Briefs of amici curiae urging reversal were filed for the State of Arizona et al. by the Attorneys General for their respective States as follows: Robert K. Corbin of Arizona, Norman C. Gorsuch of Alaska, John Van de Kamp of California, Duane Woodard of Colorado, Joseph Lieberman of Connecticut, Jim Smith of Florida, Michael Lilly of Hawaii, Jim Jones of Idaho, Neil Hartigan of Illinios, Linley E. Pearson of Indiana, David L. Armstrong of Kentucky, William J. Guste, Jr., of

Louisiana, Frank J. Kelley of Michigan, Edward L. Pittman of Mississippi, William L. Webster of Missouri, Mike Greely of Montana, Brian McKay of Nevada, Irwin L. Kimmelman of New Jersey, Paul Bardacke of New Mexico, Lacy H. Thornburg of North Carolina, Nicholas J. Spaeth of North Dakota, Anthony Celebrezze of Ohio, Michael Turpen of Oklahoma, David Fronmayer of Oregon, Dennis J. Roberts II of Rhode Island, T. Travis Medlock of South Carolina, Mark V. Meierhenry of South Dakota, W. J. Michael Cody of Tennessee, David L. Wilkinson of Utah, John J. Easton of Vermont, Kenneth O. Eikenberry of Washington, Charlie Brown of West Virginia, Bronson C. La Follette of Wisconsin, Archie G. McClintock of Wyoming; for the State of New York by Robert Abrams, Attorney General, and Robert Hermann, Solicitor General; for the City of New York et al. by Frederick A. O. Schwarz, Jr., James D. Montgomery, and [473 U.S. 479, 481] Barbara W. Mather; and for the County of Suffolk, New York, by Mark D. Cohen. Briefs of amici curiae urging affirmance were filed for the Alliance of American Insurers et al. by James F. Fitzpatrick and John M. Quinn; for the American Institute of Certified Public Accountants by Philip A. Lacovara, Jay Kelly Wright, Kenneth J. Bialkin, and Louis A. Craco; and for the Securities Industry Association by Joel W. Sternman, Eugene A. Gaer, and William J. Fitzpatrick. [473 U.S. 479, 481]

JUSTICE WHITE delivered the opinion of the Court.

The Racketeer Influenced and Corrupt Organizations Act (RICO), Pub. L. 91-452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. 1961-1968, provides a private civil action to recover treble damages for injury "by reason of a violation of" its substantive provisions. 18 U.S.C. 1964(c). The initial dormancy of this provision and its recent greatly increased utilization 1 are now familiar history. 2 In response to what it perceived to be misuse of civil RICO by private plaintiffs, the court below construed 1964(c) to permit private actions only against defendants who had been convicted on criminal charges, and only where there had occurred a "racketeering injury." While we understand the court's concern over the consequences of an unbridled reading of the statute, we reject both of its holdings.

# I

RICO takes aim at "racketeering activity," which it defines as any act "chargeable" under several generically described state criminal laws, any act "indictable" under numerous specific federal criminal provisions, including mail and wire fraud, and any "offense" involving bankruptcy or securities [473 U.S. 479, 482] fraud or drug-related activities that is "punishable" under federal law. 1961(1). 3 Section 1962, entitled "Prohibited Activities," outlaws the use of income derived from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity; [473 U.S. 479, 483] conducting or participating in the conduct of an enterprise through a pattern of racketeering activity; and conspiring to violate any of these provisions. 4

Congress provided criminal penalties of imprisonment, fines, and forfeiture for violation of these provisions. 1963. In addition, it set out a far-reaching civil enforcement scheme, 1964, including the following provision for private suits:

> "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 1964(c).

In 1979, petitioner Sedima, a Belgian corporation, entered into a joint venture with respondent Imrex Co. to provide electronic components to a Belgian firm. The buyer was to order parts through Sedima;

Imrex was to obtain the parts [473 U.S. 479, 484] in this country and ship them to Europe. The agreement called for Sedima and Imrex to split the net proceeds. Imrex filled roughly $8 million in orders placed with it through Sedima. Sedima became convinced, however, that Imrex was presenting inflated bills, cheating Sedima out of a portion of its proceeds by collecting for nonexistent expenses.

In 1982, Sedima filed this action in the Federal District Court for the Eastern District of New York. The complaint set out common-law claims of unjust enrichment, conversion, and breach of contract, fiduciary duty, and a constructive trust. In addition, it asserted RICO claims under 1964(c) against Imrex and two of its officers. Two counts alleged violations of 1962(c), based on predicate acts of mail and wire fraud. See 18 U.S.C. 1341, 1343, 1961(1)(B). A third count alleged a conspiracy to violate 1962(c). Claiming injury of at least $175,000, the amount of the alleged overbilling, Sedima sought treble damages and attorney's fees.

The District Court held that for an injury to be "by reason of a violation of section 1962," as required by 1964(c), it must be somehow different in kind from the direct injury resulting from the predicate acts of racketeering activity. 574 F. Supp. 963 (1983). While not choosing a precise formulation, the District Court held that a complaint must allege a "RICO-type injury," which was either some sort of distinct "racketeering injury," or a "competitive injury." It found "no allegation here of any injury apart from that which would result directly from the alleged predicate acts of mail fraud and wire fraud," id., at 965, and accordingly dismissed the RICO counts for failure to state a claim.

A divided panel of the Court of Appeals for the Second Circuit affirmed. 741 F.2d 482 (1984). After a lengthy review of the legislative history, it held that Sedima's complaint was defective in two ways. First, it failed to allege an injury "by reason of a violation of section 1962." In the court's view, [473 U.S. 479, 485] this language was a limitation on standing, reflecting Congress' intent to compensate victims of "certain specific kinds of organized criminality," not to provide additional remedies for already compensable injuries. Id., at 494. Analogizing to the Clayton Act, which had been the model for 1964(c), the court concluded that just as an antitrust plaintiff must allege an "antitrust injury," so a RICO plaintiff must allege a "racketeering injury" - an injury "different in kind from that occurring as a result of the predicate acts themselves, or not simply caused by the predicate acts, but also caused by an activity which RICO was designed to deter." Id., at 496. Sedima had failed to allege such an injury.

The Court of Appeals also found the complaint defective for not alleging that the defendants had already been criminally convicted of the predicate acts of mail and wire fraud, or of a RICO violation. This element of the civil cause of action was inferred from 1964(c)'s reference to a "violation" of 1962, the court also observing that its prior-conviction requirement would avoid serious constitutional difficulties, the danger of unfair stigmatization, and problems regarding the standard by which the predicate acts were to be proved.

The decision below was one episode in a recent proliferation of civil RICO litigation within the Second Circuit 5 and [473 U.S. 479, 486] in other Courts of Appeals. 6 In light of the variety of approaches taken by the lower courts and the importance of the issues, we granted certiorari. 469 U.S. 1157 (1984). We now reverse.

## II

As a preliminary matter, it is worth briefly reviewing the legislative history of the private treble-damages action. RICO formed Title IX of the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 922. The civil remedies in the bill passed by the Senate, S. 30, were limited to injunctive actions by the United States and became 1964(a), (b), and [473 U.S. 479, 487] (d). Previous versions of

the legislation, however, had provided for a private treble-damages action in exactly the terms ultimately adopted in 1964(c). See S. 1623, 91st Cong., 1st Sess., 4(a) (1969); S. 2048 and S. 2049, 90th Cong., 1st Sess. (1967).

During hearings on S. 30 before the House Judiciary Committee, Representative Steiger proposed the addition of a private treble-damages action "similar to the private damage remedy found in the anti-trust laws. . . . [T]hose who have been wronged by organized crime should at least be given access to a legal remedy. In addition, the availability of such a remedy would enhance the effectiveness of title IX's prohibitions." Hearings on S. 30, and Related Proposals, before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 520 (1970) (hereinafter House Hearings). The American Bar Association also proposed an amendment "based upon the concept of Section 4 of the Clayton Act." Id., at 543-544, 548, 559; see 116 Cong. Rec. 25190-25191 (1970). See also H. R. 9327, 91st Cong., 1st Sess. (1969) (House counterpart to S. 1623).

Over the dissent of three members, who feared the treble-damages provision would be used for malicious harassment of business competitors, the Committee approved the amendment. H. R. Rep. No. 91-1549, pp. 58, 187 (1970). In summarizing the bill on the House floor, its sponsor described the treble-damages provision as "another example of the antitrust remedy being adapted for use against organized criminality." 116 Cong. Rec. 35295 (1970). The full House then rejected a proposal to create a complementary treble-damages remedy for those injured by being named as defendants in malicious private suits. Id., at 35342. Representative Steiger also offered an amendment that would have allowed private injunctive actions, fixed a statute of limitations, and clarified venue and process requirements. Id., at 35346; see id., at 35226-35227. The proposal was greeted with some hostility because it had not been reviewed in Committee, [473 U.S. 479, 488]  and Steiger withdrew it without a vote being taken. Id., at 35346-35347. The House then passed the bill, with the treble-damages provision in the form recommended by the Committee. Id., at 35363-35364.

The Senate did not seek a conference and adopted the bill as amended in the House. Id., at 36296. The treble-damages provision had been drawn to its attention while the legislation was still in the House, and had received the endorsement of Senator McClellan, the sponsor of S. 30, who was of the view that the provision would be "a major new tool in extirpating the baneful influence of organized crime in our economic life." Id., at 25190.

### III

The language of RICO gives no obvious indication that a civil action can proceed only after a criminal conviction. The word "conviction" does not appear in any relevant portion of the statute. See 1961, 1962, 1964(c). To the contrary, the predicate acts involve conduct that is "chargeable" or "indictable," and "offense[s]" that are "punishable," under various criminal statutes. 1961(1). As defined in the statute, racketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be. See also S. Rep. No. 91-617, p. 158 (1969): "a racketeering activity . . . must be an act in itself subject to criminal sanction" (emphasis added). Thus, a prior-conviction requirement cannot be found in the definition of "racketeering activity." Nor can it be found in 1962, which sets out the statute's substantive provisions. Indeed, if either 1961 or 1962 did contain such a requirement, a prior conviction would also be a prerequisite, nonsensically, for a criminal prosecution, or for a civil action by the Government to enjoin violations that had not yet occurred.

The Court of Appeals purported to discover its prior-conviction requirement in the term "violation" in 1964(c). 741 F.2d, at 498-499. However, even if that term were [473 U.S. 479, 489]  read to refer to a criminal conviction, it would require a conviction under RICO, not of the predicate offenses. That aside, the term "violation" does not imply a criminal conviction. See United States v. Ward, 448 U.S.

242, 249 -250 (1980). It refers only to a failure to adhere to legal requirements. This is its indisputable meaning elsewhere in the statute. Section 1962 renders certain conduct "unlawful"; 1963 and 1964 impose consequences, criminal and civil, for "violations" of 1962. We should not lightly infer that Congress intended the term to have wholly different meanings in neighboring subsections. 7

The legislative history also undercuts the reading of the court below. The clearest current in that history is the reliance on the Clayton Act model, under which private and governmental actions are entirely distinct. E. g., United States v. Borden Co., 347 U.S. 514, 518 -519 (1954). 8 The only [473 U.S. 479, 490] specific reference in the legislative history to prior convictions of which we are aware is an objection that the treble-damages provision is too broad precisely because "there need not be a conviction under any of these laws for it to be racketeering." 116 Cong. Rec. 35342 (1970) (emphasis added). The history is otherwise silent on this point and contains nothing to contradict the import of the language appearing in the statute. Had Congress intended to impose this novel requirement, there would have been at least some mention of it in the legislative history, even if not in the statute.

The Court of Appeals was of the view that its narrow construction of the statute was essential to avoid intolerable practical consequences. 9 First, without a prior conviction to rely on, the plaintiff would have to prove commission of the predicate acts beyond a reasonable doubt. This would require instructing the jury as to different standards of proof for different aspects of the case. To avoid this awkwardness, [473 U.S. 479, 491] the court inferred that the criminality must already be established, so that the civil action could proceed smoothly under the usual preponderance standard.


We are not at all convinced that the predicate acts must be established beyond a reasonable doubt in a proceeding under 1964(c). In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard. See, e. g., United States v. One Assortment of 89 Firearms, 465 U.S. 354 (1984); One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 235 (1972); Helvering v. Mitchell, 303 U.S. 391, 397 (1938); United States v. Regan, 232 U.S. 37, 47 -49 (1914). There is no indication that Congress sought to depart from this general principle here. See Measures Relating to Organized Crime, Hearings on S. 30 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 388 (1969) (statement of Assistant Attorney General Wilson); House Hearings, at 520 (statement of Rep. Steiger); id., at 664 (statement of Rep. Poff); 116 Cong. Rec. 35313 (1970) (statement of Rep. Minish). That the offending conduct is described by reference to criminal statutes does not mean that its occurrence must be established by criminal standards or that the consequences of a finding of liability in a private civil action are identical to the consequences of a criminal conviction. Cf. United States v. Ward, supra, at 248-251. But we need not decide the standard of proof issue today. For even if the stricter standard is applicable to a portion of the plaintiff's proof, the resulting logistical difficulties, which are accepted in other contexts, would not be so great as to require invention of a requirement that cannot be found in the statute and that Congress, as even the Court of Appeals had to concede, 741 F.2d, at 501, did not envision. 10  [473 U.S. 479, 492]

The court below also feared that any other construction would raise severe constitutional questions, as it "would provide civil remedies for offenses criminal in nature, stigmatize defendants with the appellation `racketeer,' authorize the award of damages which are clearly punitive, including attorney's fees, and constitute a civil remedy aimed in part to avoid the constitutional protections of the criminal law." Id., at 500, n. 49. We do not view the statute as being so close to the constitutional edge. As noted above, the fact that conduct can result in both criminal liability and treble damages does not mean that there is not a bona fide civil action. The familiar provisions for both criminal liability and treble damages under the antitrust laws indicate as much. Nor are attorney's fees "clearly punitive." Cf. 42 U.S.C. 1988. As for stigma, a civil RICO proceeding leaves no greater stain than do a number of other

civil proceedings. Furthermore, requiring conviction of the predicate acts would not protect against an unfair imposition of the "racketeer" label. If there is a problem with thus stigmatizing a garden variety defrauder by means of a civil action, it is not reduced by making certain that the defendant is guilty of fraud beyond a reasonable doubt. Finally, to the extent an [473 U.S. 479, 493] action under 1964(c) might be considered quasi-criminal, requiring protections normally applicable only to criminal proceedings, cf. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965), the solution is to provide those protections, not to ensure that they were previously afforded by requiring prior convictions. 11

Finally, we note that a prior-conviction requirement would be inconsistent with Congress' underlying policy concerns. Such a rule would severely handicap potential plaintiffs. A guilty party may escape conviction for any number of reasons - not least among them the possibility that the Government itself may choose to pursue only civil remedies. Private attorney general provisions such as 1964(c) are in part designed to fill prosecutorial gaps. Cf. Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979). This purpose would be largely defeated, and the need for treble damages as an incentive to litigate unjustified, if private suits could be maintained only against those already brought to justice.

See also n. 9, supra.

In sum, we can find no support in the statute's history, its language, or considerations of policy for a requirement that a private treble-damages action under 1964(c) can proceed only against a defendant who has already been criminally convicted. To the contrary, every indication is that no such requirement exists. Accordingly, the fact that Imrex and the individual defendants have not been convicted under RICO or the federal mail and wire fraud statutes does not bar Sedima's action.

# IV

In considering the Court of Appeals' second prerequisite for a private civil RICO action - "injury . . . caused by an [473 U.S. 479, 494] activity which RICO was designed to deter" - we are somewhat hampered by the vagueness of that concept. Apart from reliance on the general purposes of RICO and a reference to "mobsters," the court provided scant indication of what the requirement of racketeering injury means. It emphasized Congress' undeniable desire to strike at organized crime, but acknowledged and did not purport to overrule Second Circuit precedent rejecting a requirement of an organized crime nexus. 741 F.2d, at 492; see Moss v. Morgan Stanley, Inc., 719 F.2d 5, 21 (CA2 1983), cert. denied sub nom. Moss v. Newman, 465 U.S. 1025 (1984). The court also stopped short of adopting a "competitive injury" requirement; while insisting that the plaintiff show "the kind of economic injury which has an effect on competition," it did not require "actual anticompetitive effect." 741 F.2d, at 496; see also id., at 495, n. 40.

The court's statement that the plaintiff must seek redress for an injury caused by conduct that RICO was designed to deter is unhelpfully tautological. Nor is clarity furnished by a negative statement of its rule: standing is not provided by the injury resulting from the predicate acts themselves. That statement is itself apparently inaccurate when applied to those predicate acts that unmistakably constitute the kind of conduct Congress sought to deter. See id., at 496, n. 41. The opinion does not explain how to distinguish such crimes from the other predicate acts Congress has lumped together in 1961(1). The court below is not alone in struggling to define "racketeering injury," and the difficulty of that task itself cautions against imposing such a requirement. 12 [473 U.S. 479, 495]

We need not pinpoint the Second Circuit's precise holding, for we perceive no distinct "racketeering injury" requirement. Given that "racketeering activity" consists of no more and no less than

commission of a predicate act, 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm from the predicate acts. A reading of the statute belies any such requirement. Section 1964(c) authorizes a private suit by "[a]ny person injured in his business or property by reason of a violation of 1962." Section 1962 in turn makes it unlawful for "any person" - not just mobsters - to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity. 1962(a)-(c). If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement. 13  [473 U.S. 479, 496]

A violation of 1962(c), the section on which Sedima relies, requires (1) conduct (2) of an enterprise (3) through a pattern 14 (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim. Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of 1962, nor is mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated, "[a] defendant who violates section 1962 is not liable [473 U.S. 479, 497]  for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (1984), aff'd, post, p. 606.

But the statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of 1962(c) will flow from the commission of the predicate acts. 15

This less restrictive reading is amply supported by our prior cases and the general principles surrounding this statute. RICO is to be read broadly. This is the lesson not only [473 U.S. 479, 498]  of Congress' self-consciously expansive language and overall approach, see United States v. Turkette, 452 U.S. 576, 586 -587 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub. L. 91-452, 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity. See also n. 10, supra. Far from effectuating these purposes, the narrow readings offered by the dissenters and the court below would in effect eliminate 1964(c) from the statute.

RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime. See generally Russello v. United States, 464 U.S. 16, 26 -29 (1983). While few of the legislative statements about novel remedies and attacking crime on all fronts, see ibid., were made with direct reference to 1964(c), it is in this spirit that all of the Act's provisions should be read. The specific references to 1964(c) are consistent with this overall approach. Those supporting 1964(c) hoped it would "enhance the effectiveness of title IX's prohibitions," House Hearings, at 520, and provide "a major new tool," 116 Cong. Rec. 35227 (1970). See also id., at 25190; 115 Cong. Rec. 6993-6994 (1969). Its opponents, also recognizing the provision's scope, complained that it provided too easy a weapon against "innocent businessmen," H. R. Rep. No. 91-1549, p. 187 (1970), and would be prone to abuse, 116 Cong. Rec. 35342 (1970). It is also significant that a previous proposal to add RICO-like provisions to the Sherman Act had come to grief in part precisely because it "could create inappropriate and unnecessary obstacles in the way of . . . a private litigant [who] would have to contend with a body of precedent - appropriate in a purely antitrust context - setting strict requirements on questions such as

`standing to sue' and `proximate cause.'" 115 Cong. Rec. 6995 (1969) (ABA comments on S. 2048); see also id., at 6993 (S. 1623 proposed as an amendment to Title 18 to avoid these problems). In borrowing its "racketeering [473 U.S. 479, 499]  injury" requirement from antitrust standing principles, the court below created exactly the problems Congress sought to avoid.

Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put. 741 F.2d, at 487. Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate `enterprises.'" Ibid. Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. United States v. Turkette, supra. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. Nor does it reveal the "ambiguity" discovered by the court below. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Haroco, Inc. v. American National Bank & Trust Co. of Chicago, supra, at 398.

It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster. 16 Yet this defect - if defect it is - is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations [473 U.S. 479, 500]  where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.

We nonetheless recognize that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors. See generally ABA Report, at 55-69. Though sharing the doubts of the Court of Appeals about this increasing divergence, we cannot agree with either its diagnosis or its remedy. The "extraordinary" uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern." We do not believe that the amorphous standing requirement imposed by the Second Circuit effectively responds to these problems, or that it is a form of statutory amendment appropriately undertaken by the courts.

## V

Sedima may maintain this action if the defendants conducted the enterprise through a pattern of racketeering activity. The questions whether the defendants committed the requisite predicate acts, and whether the commission of those acts fell into a pattern, are not before us. The complaint is not deficient for failure to allege either an injury separate from the financial loss stemming from the alleged acts of mail and wire fraud, or prior convictions of the defendants. The judgment below is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

## Footnotes

[ Footnote 1 ] Of 270 District Court RICO decisions prior to this year, only 3% (nine cases) were decided throughout the 1970's, 2% were decided in 1980, 7% in 1981, 13% in 1982, 33% in 1983, and 43% in 1984. Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 55 (1985) (hereinafter ABA Report); see also id., at 53a (table).

[ Footnote 2 ] For a thorough bibliography of civil RICO decisions and commentary, see Milner, A

Case: 3:12-cv-01801-JJH Doc #: 10 Filed: 08/06/12 27 of 61. PageID #: 120

Civil RICO Bibliography, 21 C. W. L. R. 409 (1985).

[ Footnote 3 ] RICO defines "racketeering activity" to mean "(A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2320 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-2424 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States, or (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act." 18 U.S.C. 1961(1) (1982 ed., Supp. III).

[ Footnote 4 ] In relevant part, 18 U.S.C. 1962 provides: "(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . . "(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. "(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

[ Footnote 5 ] The day after the decision in this case, another divided panel of the Second Circuit reached a similar conclusion. Bankers Trust Co. v. Rhoades, 741 F.2d 511 (1984), cert. pending, No. 84-657. It held that 1964(c) allowed recovery only for injuries resulting not from the predicate acts, but from the fact that they were part of a pattern. "If a plaintiff's injury is that caused by the predicate acts

themselves, he is injured regardless of whether or not there is a pattern; hence he cannot be said to be injured by the pattern," and cannot recover. Id., at 517 (emphasis in original). The following day, a third panel of the same Circuit, this time unanimous, decided Furman v. Cirrito, 741 F.2d 524 (1984), cert. pending, No. 84-604. In that case, the District Court had dismissed the complaint for failure to allege a distinct racketeering injury. The Court of Appeals affirmed, relying on the opinions in Sedima and Bankers Trust, but wrote [473 U.S. 479, 486] at some length to record its disagreement with those decisions. The panel would have required no injury beyond that resulting from the predicate acts.

[ Footnote 6 ] A month after the trio of Second Circuit opinions was released, the Eighth Circuit decided Alexander Grant & Co. v. Tiffany Industries, Inc., 742 F.2d 408 (1984), cert. pending, Nos. 84-1084, 84-1222. Viewing its decision as contrary to Sedima but consistent with, though broader than, Bankers Trust, the court held that a RICO claim does require some unspecified element beyond the injury flowing directly from the predicate acts. At the same time, it stood by a prior decision that had rejected any requirement that the injury be solely commercial or competitive, or that the defendants be involved in organized crime. 742 F.2d, at 413; see Bennett v. Berg, 685 F.2d 1053, 1058-1059, 1063-1064 (CA8 1982), aff'd in part and rev'd in part, 710 F.2d 1361 (en banc), cert. denied, 464 U.S. 1008 (1983). Two months later, the Seventh Circuit decided Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384 (1984), aff'd, post, p. 606. Dismissing Sedima as the resurrection of the discredited requirement of an organized crime nexus, and Bankers Trust as an emasculation of the treble-damages remedy, the Seventh Circuit rejected "the elusive racketeering injury requirement." 747 F.2d, at 394, 398-399. The Fifth Circuit had taken a similar position. Alcorn County v. U.S. Interstate Supplies, Inc., 731 F.2d 1160, 1169 (1984). The requirement of a prior RICO conviction was rejected in Bunker Ramo Corp. v. United Business Forms, Inc., 713 F.2d 1272, 1286-1287 (CA7 1983), and USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94 (CA6 1982). See also United States v. Cappetto, 502 F.2d 1351 (CA7 1974), cert. denied, 420 U.S. 925 (1975) (civil action by Government).

[ Footnote 7 ] When Congress intended that the defendant have been previously convicted, it said so. Title 18 U.S.C. 1963(f) (1982 ed., Supp. III) states that "[u]pon conviction of a person under this section," his forfeited property shall be seized. Likewise, in Title X of the same legislation Congress explicitly required prior convictions, rather than prior criminal activity, to support enhanced sentences for special offenders. See 18 U.S.C. 3575(e).

[ Footnote 8 ] The court below considered it significant that 1964(c) requires a "violation of section 1962," whereas the Clayton Act speaks of "anything forbidden in the antitrust laws." 741 F.2d, at 488; see 15 U.S.C. 15(a). The court viewed this as a deliberate change indicating Congress' desire that the underlying conduct not only be forbidden, but also have led to a criminal conviction. There is nothing in the legislative history to support this interpretation, and we cannot view this minor departure in wording, without more, to indicate a fundamental departure in meaning. Representative Steiger, who proposed this wording in the House, nowhere indicated a desire to depart from the antitrust model in this regard. See 116 Cong. Rec. 35227, 35246 (1970). To the contrary, he viewed the treble-damages provision as a "parallel private remedy." Id., at 27739 (letter to House Judiciary Committee). Likewise, Senator Hruska's discussion of his identically worded proposal gives no hint of any such intent. See 115 Cong. Rec. 6993 (1969). In any event, the change in language does not support [473 U.S. 479, 490] the court's drastic inference. It seems more likely that the language was chosen because it is more succinct than that in the Clayton Act, and is consistent with the neighboring provisions. See 1963(a), 1964(a).

[ Footnote 9 ] It is worth bearing in mind that the holding of the court below is not without problematic consequences of its own. It arbitrarily restricts the availability of private actions, for lawbreakers are often not apprehended and convicted. Even if a conviction has been obtained, it is unlikely that a private plaintiff will be able to recover for all of the acts constituting an extensive "pattern," or that

multiple victims will all be able to obtain redress. This is because criminal convictions are often limited to a small portion of the actual or possible charges. The decision below would also create peculiar incentives for plea bargaining to non-predicate-act offenses so as to ensure immunity from a later civil suit. If nothing else, a criminal defendant might plead to a tiny fraction of counts, so as to limit future civil liability. In addition, the dependence of potential civil litigants on the initiation and success of a criminal prosecution could lead to unhealthy private pressures on prosecutors and to self-serving trial testimony, or at least accusations thereof. Problems would also arise if some or all of the convictions were reversed on appeal. Finally, the compelled wait for the completion of criminal proceedings would result in pursuit of stale claims, complex statute of limitations problems, or the wasteful splitting of actions, with resultant claim and issue preclusion complications.

[ Footnote 10 ] The Court of Appeals also observed that allowing civil suits without prior convictions "would make a hash" of the statute's liberal-construction requirement. 741 F.2d, at 502; see RICO 904(a). Since criminal [473 U.S. 479, 492] statutes must be strictly construed, the court reasoned, allowing liberal construction of RICO - an approach often justified on the ground that the conduct for which liability is imposed is "already criminal" - would only be permissible if there already existed criminal convictions. Again, we have doubts about the premise of this rather convoluted argument. The strict-construction principle is merely a guide to statutory interpretation. Like its identical twin, the "rule of lenity," it "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." Callanan v. United States, 364 U.S. 587, 596 (1961); see also United States v. Turkette, 452 U.S. 576, 587 -588 (1981). But even if that principle has some application, it does not support the court's holding. The strict- and liberal-construction principles are not mutually exclusive; 1961 and 1962 can be strictly construed without adopting that approach to 1964(c). Cf. United States v. United States Gypsum Co., 438 U.S. 422, 443 , n. 19 (1978). Indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in 1964, where RICO's remedial purposes are most evident.

[ Footnote 11 ] Even were the constitutional questions more significant, any doubts would be insufficient to overcome the mandate of the statute's language and history. "Statutes should be construed to avoid constitutional questions, but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." United States v. Albertini, 472 U.S. 675, 680 (1985).

[ Footnote 12 ] The decision below does not appear identical to Bankers Trust. It established a standing requirement, whereas Bankers Trust adopted a limitation on damages. The one focused on the mobster element, the other took a more conceptual approach, distinguishing injury caused by the individual acts from injury caused by their cumulative effect. Thus, the Eighth Circuit has indicated its agreement with Bankers Trust but not [473 U.S. 479, 495] Sedima. Alexander Grant & Co. v. Tiffany Industries, Inc., 742 F.2d, at 413. See also Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d, at 396. The two tests were described as "very different" by the ABA Task Force. See ABA Report, at 310. Yet the Bankers Trust court itself did not seem to think it was departing from Sedima, see 741 F.2d, at 516-517, and other Second Circuit panels have treated the two decisions as consistent, see Furman v. Cirrito, 741 F.2d 524 (1984), cert. pending, No. 84-604; Durante Brothers & Sons, Inc. v. Flushing National Bank, 755 F.2d 239, 246 (1985). The evident difficulty in discerning just what the racketeering injury requirement consists of would make it rather hard to apply in practice or explain to a jury.

[ Footnote 13 ] Given the plain words of the statute, we cannot agree with the court below that Congress could have had no "inkling of [ 1964(c)'s] implications." 741 F.2d, at 492. Congress' "inklings" are best determined by the statutory language that it chooses, and the language it chose here extends far beyond the limits drawn by the Court of Appeals. Nor does the "clanging silence" of the legislative history, ibid., justify those limits. For one thing, 1964(c) did not pass through Congress unnoticed. See Part II, [473 U.S. 479, 496]  supra. In addition, congressional silence, no matter how "clanging," cannot override the words of the statute.

[ Footnote 14 ] As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in 1961 in that it states that a pattern "requires at least two acts of racketeering activity," 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one `racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." S. Rep. No. 91-617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term `pattern' itself requires the showing of a relationship . . . . So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern . . . ." 116 Cong. Rec. 18940 (1970) (statement of Sen. McClellan). See also id., at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. 3575(e). This language may be useful in interpreting other sections of the Act. Cf. Iannelli v. United States, 420 U.S. 770, 789 (1975).

[ Footnote 15 ] Such damages include, but are not limited to, the sort of competitive injury for which the dissenters would allow recovery. See post, at 521-522. Under the dissent's reading of the statute, the harm proximately caused by the forbidden conduct is not compensable, but that ultimately and indirectly flowing therefrom is. We reject this topsy-turvy approach, finding no warrant in the language or the history of the statute for denying recovery thereunder to "the direct victims of the [racketeering] activity," post, at 522, while preserving it for the indirect. Even the court below was not that grudging. It would apparently have allowed recovery for both the direct and the ultimate harm flowing from the defendant's conduct, requiring injury "not simply caused by the predicate acts, but also caused by an activity which RICO was designed to deter." 741 F.2d, at 496 (emphasis added). The dissent would also go further than did the Second Circuit in its requirement that the plaintiff have suffered a competitive injury. Again, as the court below stated, Congress "nowhere suggested that actual anti-competitive effect is required for suits under the statute." Ibid. The language it chose, allowing recovery to "[a]ny person injured in his business or property," 1964(c) (emphasis added), applied to this situation, suggests that the statute is not so limited.

[ Footnote 16 ] The ABA Task Force found that of the 270 known civil RICO cases at the trial court level, 40% involved securities fraud, 37% common-law fraud in a commercial or business setting, and only 9% "allegations of criminal activity of a type generally associated with professional criminals."

ABA Report, at 55-56. Another survey of 132 published decisions found that 57 involved securities transactions and 38 commercial and contract disputes, while no other category made it into double figures. American Institute of Certified Public Accountants, The Authority to Bring Private Treble-Damage Suits Under "RICO" Should be Removed 13 (Oct. 10, 1984).

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE POWELL join, dissenting. *

The Court today recognizes that "in its private civil version, RICO is evolving into something quite different from [473 U.S. 479, 501] the original conception of its enactors." Ante, at 500. The Court, however, expressly validates this result, imputing it to the manner in which the statute was drafted. I fundamentally disagree both with the Court's reading of the statute and with its conclusion. I believe that the statutory language and history disclose a narrower interpretation of the statute that fully effectuates Congress' purposes, and that does not make compensable under civil RICO a host of claims that Congress never intended to bring within RICO's purview.

# I

The Court's interpretation of the civil RICO statute quite simply revolutionizes private litigation; it validates the federalization of broad areas of state common law of frauds, and it approves the displacement of well-established federal remedial provisions. We do not lightly infer a congressional intent to effect such fundamental changes. To infer such intent here would be untenable, for there is no indication that Congress even considered, much less approved, the scheme that the Court today defines.

The single most significant reason for the expansive use of civil RICO has been the presence in the statute, as predicate acts, of mail and wire fraud violations. See 18 U.S.C. 1961(1) (1982 ed., Supp. III). Prior to RICO, no federal statute had expressly provided a private damages remedy based upon a violation of the mail or wire fraud statutes, which make it a federal crime to use the mail or wires in furtherance of a scheme to defraud. See 18 U.S.C. 1341, 1343. Moreover, the Courts of Appeals consistently had held that no implied federal private causes of action accrue to victims of these federal violations. See, e. g., Ryan v. Ohio Edison Co., 611 F.2d 1170, 1178-1179 (CA6 1979) (mail fraud); Napper v. Anderson, Henley, Shields, Bradford & Pritchard, 500 F.2d 634, 636 (CA5 1974) (wire fraud), cert. denied, 423 U.S. 837 (1975). The victims normally were restricted to bringing actions in state court under common-law fraud theories. [473 U.S. 479, 502]

Under the Court's opinion today, two fraudulent mailings or uses of the wires occurring within 10 years of each other might constitute a "pattern of racketeering activity," 1961 (5), leading to civil RICO liability. See 1964(c). The effects of making a mere two instances of mail or wire fraud potentially actionable under civil RICO are staggering, because in recent years the Courts of Appeals have "tolerated an extraordinary expansion of mail and wire fraud statutes to permit federal prosecution for conduct that some had thought was subject only to state criminal and civil law." United States v. Weiss, 752 F.2d 777, 791 (CA2 1985) (Newman, J., dissenting). In bringing criminal actions under those statutes, prosecutors need not show either a substantial connection between the scheme to defraud and the mail and wire fraud statutes, see Pereira v. United States, 347 U.S. 1, 8 (1954), or that the fraud involved money or property. Courts have sanctioned prosecutions based on deprivations of such intangible rights as a shareholder's right to "material" information, United States v. Siegel, 717 F.2d 9, 14-16 (CA2 1983); a client's right to the "undivided loyalty" of his attorney, United States v. Bronston, 658 F.2d 920, 927 (CA2 1981), cert. denied, 456 U.S. 915 (1982); an employer's right to the honest and faithful service of his employees, United States v. Bohonus, 628 F.2d 1167, 1172 (CA9), cert. denied, 447 U.S. 928 (1980); and a citizen's right to know the nature of agreements entered into by the leaders

of political parties, United States v. Margiotta, 688 F.2d 108, 123-125 (CA2 1982), cert. denied, 461 U.S. 913 (1983).

The only restraining influence on the "inexorable expansion of the mail and wire fraud statutes," United States v. Siegel, supra, at 24 (Winter, J., dissenting in part and concurring in part), has been the prudent use of prosecutorial discretion. Prosecutors simply do not invoke the mail and wire fraud provisions in every case in which a violation of the relevant statute can be proved. See U.S. Dept. of Justice, United States Attorney's Manual 9-43.120 (Feb. 16, 1984). [473 U.S. 479, 503]  For example, only where the scheme is directed at a "class of persons or the general public" and includes "a substantial pattern of conduct," will "serious consideration . . . be given to [mail fraud] prosecution." In all other cases, "the parties should be left to settle their differences by civil or criminal litigation in the state courts." Ibid.

The responsible use of prosecutorial discretion is particularly important with respect to criminal RICO prosecutions - which often rely on mail and wire fraud as predicate acts - given the extremely severe penalties authorized by RICO's criminal provisions. Federal prosecutors are therefore instructed that "[u]tilization of the RICO statute, more so than most other federal criminal sanctions, requires particularly careful and reasoned application." Id., 9-110.200 (Mar. 9, 1984). The Justice Department itself recognizes that a broad interpretation of the criminal RICO provisions would violate "the principle that the primary responsibility for enforcing state laws rests with the state concerned." Ibid. Specifically, the Justice Department will not bring RICO prosecutions unless the pattern of racketeering activity required by 18 U.S.C. 1962 has "some relation to the purpose of the enterprise." United States Attorney's Manual 9-110.350 (Mar. 9, 1984).


Congress was well aware of the restraining influence of prosecutorial discretion when it enacted the criminal RICO provisions. It chose to confer broad statutory authority on the Executive fully expecting that this authority would be used only in cases in which its use was warranted. See Measures Relating to Organized Crime: Hearings on S. 30 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 346-347, 424 (1969) (hereinafter cited as Senate Hearings). Moreover, in seeking a broad interpretation of RICO from this Court in United States v. Turkette, 452 U.S. 576 (1981), the Government stressed that no "extreme cases" would be brought because the Justice Department would exercise [473 U.S. 479, 504]  "sound discretion" through a centralized review process. See Brief for United States in No. 80-808, O. T. 1980, p. 25, n. 20.

In the context of civil RICO, however, the restraining influence of prosecutors is completely absent. Unlike the Government, private litigants have no reason to avoid displacing state common-law remedies. Quite to the contrary, such litigants, lured by the prospect of treble damages and attorney's fees, have a strong incentive to invoke RICO's provisions whenever they can allege in good faith two instances of mail or wire fraud. Then the defendant, facing a tremendous financial exposure in addition to the threat of being labeled a "racketeer," will have a strong interest in settling the dispute. See Rakoff, Some Personal Reflections on the Sedima Case and on Reforming RICO, in RICO: Civil and Criminal 400 (Law Journal Seminars-Press 1984). The civil RICO provision consequently stretches the mail and wire fraud statutes to their absolute limits and federalizes important areas of civil litigation that until now were solely within the domain of the States.

In addition to altering fundamentally the federal-state balance in civil remedies, the broad reading of the civil RICO provision also displaces important areas of federal law. For example, one predicate offense under RICO is "fraud in the sale of securities." 18 U.S.C. 1961(1) (1982 ed., Supp. III). By alleging two instances of such fraud, a plaintiff might be able to bring a case within the scope of the civil RICO provision. It does not take great legal insight to realize that such a plaintiff would pursue his

case under RICO rather than do so solely under the Securities Act of 1933 or the Securities Exchange Act of 1934, which provide both express and implied causes of action for violations of the federal securities laws. Indeed, the federal securities laws contemplate only compensatory damages and ordinarily do not authorize recovery of attorney's fees. By invoking RICO, in contrast, a successful [473 U.S. 479, 505] plaintiff will recover both treble damages and attorney's fees.

More importantly, under the Court's interpretation, the civil RICO provision does far more than just increase the available damages. In fact, it virtually eliminates decades of legislative and judicial development of private civil remedies under the federal securities laws. Over the years, courts have paid close attention to matters such as standing, culpability, causation, reliance, and materiality, as well as the definitions of "securities" and "fraud." See, e. g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) (purchaser/seller requirement). All of this law is now an endangered species because plaintiffs can avoid the limitations of the securities laws merely by alleging violations of other predicate acts. For example, even in cases in which the investment instrument is not a "security" covered by the federal securities laws, RICO will provide a treble-damages remedy to a plaintiff who can prove the required pattern of mail or wire fraud. Cf. Crocker National Bank v. Rockwell International Corp., 555 F. Supp. 47 (ND Cal. 1982). Before RICO, of course, the plaintiff could not have recovered under federal law for the mail or wire fraud violation.

Similarly, a customer who refrained from selling a security during a period in which its market value was declining could allege that, on two occasions, his broker recommended by telephone, as part of a scheme to defraud, that the customer not sell the security. The customer might thereby prevail under civil RICO even though, as neither a purchaser nor a seller, he would not have had standing to bring an action under the federal securities laws. See also 741 F.2d 482, 499 (1984) ("two misstatements in a proxy solicitation could subject any director in any national corporation to `racketeering' charges and the threat of treble damages and attorneys' fees").

The effect of civil RICO on federal remedial schemes is not limited to the securities laws. For example, even though [473 U.S. 479, 506] commodities fraud is not a predicate offense listed in 1961, the carefully crafted private damages causes of action under the Commodity Exchange Act may be circumvented in a commodities case through civil RICO actions alleging mail or wire fraud. See, e. g., Parnes v. Heinold Commodities, Inc., 487 F. Supp. 645 (ND Ill. 1980). The list goes on and on.

The dislocations caused by the Court's reading of the civil RICO provision are not just theoretical. In practice, this provision frequently has been invoked against legitimate businesses in ordinary commercial settings. As the Court recognizes, the ABA Task Force that studied civil RICO found that 40% of the reported cases involved securities fraud and 37% involved common-law fraud in a commercial or business setting. See ante, at 499, n. 16. Many a prudent defendant, facing ruinous exposure, will decide to settle even a case with no merit. It is thus not surprising that civil RICO has been used for extortive purposes, giving rise to the very evils that it was designed to combat. Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 69 (1985) (hereinafter cited as ABA Report).

Only 9% of all civil RICO cases have involved allegations of criminal activity normally associated with professional criminals. See ante, at 499, n. 16. The central purpose that Congress sought to promote through civil RICO is now a mere footnote.

In summary, in both theory and practice, civil RICO has brought profound changes to our legal landscape. Undoubtedly, Congress has the power to federalize a great deal of state common law, and there certainly are no relevant constraints on its ability to displace federal law. Those, however, are not the questions that we face in this case. What we have to decide here, instead, is whether Congress in

fact intended to produce these far-reaching results. [473 U.S. 479, 507]

Established canons of statutory interpretation counsel against the Court's reading of the civil RICO provision. First, we do not impute lightly a congressional intention to upset the federal-state balance in the provision of civil remedies as fundamentally as does this statute under the Court's view. For example, in Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977), we stated that "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities." Id., at 479. Here, with striking nonchalance, the Court does what it declined to do in Santa Fe Industries - and much more as well. Second, with respect to effects on the federal securities laws and other federal regulatory statutes, we should be reluctant to displace the well-entrenched federal remedial schemes absent clear direction from Congress. See, e. g., Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1, 23 -24 (1976); Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976).

In this case, nothing in the language of the statute or the legislative history suggests that Congress intended either the federalization of state common law or the displacement of existing federal remedies. Quite to the contrary, all that the statute and the legislative history reveal as to these matters is what Judge Oakes called a "clanging silence," 741 F.2d, at 492.

Moreover, if Congress had intended to bring about dramatic changes in the nature of commercial litigation, it would at least have paid more than cursory attention to the civil RICO provision. This provision was added in the House of Representatives after the Senate already had passed its version of the RICO bill; the House itself adopted a civil remedy provision almost as an afterthought; and the Senate thereafter accepted the House's version of the bill without even requesting a Conference. See infra, at 518-519. Congress simply does not act in this way when it intends to effect fundamental changes in the structure of federal law. [473 U.S. 479, 508]

## II

The statutory language and legislative history support the view that Congress did not intend to effect a radical alteration of federal civil litigation. In fact, the language and history indicate a congressional intention to limit, in a workable and coherent manner, the type of injury that is compensable under the civil RICO provision. As the following demonstrates, Congress sought to fill an existing gap in civil remedies and to provide a means of compensation that otherwise did not exist for the honest businessman harmed by the economic power of "racketeers."

## A

I begin with a review of the statutory language. Section 1964(c) grants a private right of action to any person "injured in his business or property by reason of a violation of section 1962." Section 1962, in turn, makes it unlawful to invest, in an enterprise engaged in interstate commerce, funds "derived . . . from a pattern of racketeering activity," to acquire or operate an interest in any such enterprise through "a pattern of racketeering activity," or to conduct or participate in the conduct of that enterprise "through a pattern of racketeering activity." Section 1961 defines "racketeering activity" to mean any of numerous acts "chargeable" or "indictable" under enumerated state and federal laws, including state-law murder, arson, and bribery statutes, federal mail and wire fraud statutes, and the antifraud provisions of federal securities laws. It states that "a pattern" of racketeering activity requires proof of at least two acts of racketeering within 10 years.

By its terms, 1964(c) therefore grants a cause of action only to a person injured "by reason of a

violation of 1962." The Court holds today that the only injury a plaintiff need allege is injury occurring by reason of a predicate, or racketeering, act - i. e., one of the offenses listed in 1961. But 1964(c) does not by its terms provide a remedy for injury by [473 U.S. 479, 509]  reason of 1961; it requires an injury by reason of 1962. In other words:

> "While section 1962 prohibits the involvement of an `enterprise' in `racketeering activity,' racketeering itself is not a violation of 1962. Thus, a construction of RICO permitting recovery for damages arising out of the racketeering acts simply does not comport with the statute as written by Congress. In effect, the broad construction replaces the rule that treble damages can be recovered only when they occur `by reason of a violation of section 1962,' with a rule permitting recovery of treble damages whenever there has been a violation of section 1962. Such unwarranted judicial interference with the Act's plain meaning cannot be justified." Comment, 76 Nw. U. L. Rev. 100, 128 (1981) (footnotes omitted).

See also Bridges, Private RICO Litigation Based Upon "Fraud in the Sale of Securities," 18 Ga. L. Rev. 43, 67 (1983).

In addition, the statute permits recovery only for injury to business or property. It therefore excludes recovery for personal injuries. However, many of the predicate acts listed in 1961 threaten or inflict personal injuries - such as murder and kidnaping. If Congress in fact intended the victims of the predicate acts to recover for their injuries, as the Court holds it did, it is inexplicable why Congress would have limited recovery to business or property injury. It simply makes no sense to allow recovery by some, but not other victims of predicate acts, and to make recovery turn solely on whether the defendant has chosen to inflict personal pain or harm to property in order to accomplish its end.

In summary, the statute clearly contemplates recovery for injury resulting from the confluence of events described in 1962 and not merely from the commission of a predicate act. The Court's contrary interpretation distorts the statutory language under the guise of adopting a plain-meaning definition, and it does so without offering any indication of congressional [473 U.S. 479, 510]  intent that justifies a deviation from what I have shown to be the plain meaning of the statute. However, even if the statutory language were ambiguous, see Haroco, Inc. v. American National Bank & Trust Co. of Chicago, 747 F.2d 384, 389 (CA7 1984), aff'd, post, p. 606, the scope of the civil RICO provision would be no different, for this interpretation of the statute finds strong support in the legislative history of that provision.

## B

In reviewing the legislative history of civil RICO, numerous federal courts have become mired in controversy about the extent to which Congress intended to adopt or reject the federal antitrust laws as a model for the RICO provisions. The basis for the dispute among the lower courts is the language of the treble-damages provision, which tracks virtually word for word the treble-damages provision of the antitrust laws, 4 of the Clayton Act; 1 given this parallel, there can be little doubt that the latter served as a model for the former. Some courts have relied heavily on this congruity to read an antitrust-type "competitive injury" requirement into the civil RICO statute. See, e. g., North Barrington Development, Inc. v. Fanslow, 547 F. Supp. 207 (ND Ill. 1980). Other courts have rejected a competitive-injury requirement, or any antitrust analogy, relying in significant part on what [473 U.S. 479, 511]  they perceive as Congress' rejection of a wholesale adoption of antitrust precedent. See, e. g., Yancoski v. E. F. Hutton & Co., Inc., 581 F. Supp. 88 (ED Pa. 1983); Mauriber v. Shearson/American Express, Inc., 567 F. Supp. 1231, 1240 (SDNY 1983).

Many of these courts have read far too much into the antitrust analogy. The legislative history makes clear that Congress viewed the form of civil remedies under RICO as analogous to such remedies under the antitrust laws, but that it did not thereby intend the substantive compensable injury to be exactly the same. The legislative history also suggests that Congress might have wanted to avoid saddling the civil RICO provisions with the same standing requirements that at the time limited standing to sue under the antitrust laws. However, the Committee Reports and hearings in no way suggest that Congress considered and rejected a requirement of injury separate from that resulting from the predicate acts. Far from it, Congress offered considerable indication that the kind of injury it primarily sought to attack and compensate was that for which existing civil and criminal remedies were inadequate or nonexistent; the requisite injury is thus akin to, but broader than, that targeted by the antitrust laws and different in kind from that resulting from the underlying predicate acts.

A brief look at the legislative history makes clear that the antitrust laws in no relevant respect constrain our analysis or preclude formulation of an independent RICO-injury requirement. When Senator Hruska first introduced to Congress the predecessor to RICO, he proposed an amendment to the Sherman Act that would have prohibited the investment or use of intentionally unreported income from one line of business to establish, operate, or invest in another line of business. S. 2048, 90th Cong., 1st Sess. (1967). After studying the provision, the American Bar Association issued a report that, while acknowledging the effects of organized crime's infiltration of legitimate business, stated a preference for a [473 U.S. 479, 512]  provision separate from the antitrust laws. See 115 Cong. Rec. 6994 (1969). According to the report:

> "By placing the antitrust-type enforcement and recovery procedures in a separate statute, a commingling of criminal enforcement goals with the goals of regulating competition is avoided.

> . . . . .

> "Moreover, the use of antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with a body of precedent - appropriate in a purely antitrust context - setting strict requirements on questions such as `standing to sue' and `proximate cause.'" Id., at 6995.

Congress subsequently decided not to pursue an addition to the antitrust laws but instead to fashion a wholly separate criminal statute. If in fact that decision was made in response to the ABA's statement and not to other political concerns, it may be interpreted at most as a rejection of antitrust standing requirements. Court-developed standing rules define the requisite proximity between the plaintiff's injury and the defendant's antitrust violation. See Blue Shield of Virginia v. McCready, 457 U.S. 465, 476 (1982) (discussing antitrust standing rules developed in the Federal Circuits). Thus, at most we may read the early legislative history to eschew wholesale adoption of the particular nexus requirements that limit the class of potential antitrust plaintiffs. Courts that read this history to bar any analogy to the antitrust laws simply read too much into the scant evidence available to us. In particular, courts that read this history to bar an injury requirement akin to "antitrust" injury are in error. The requirement of antitrust injury, as articulated in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), differs in kind from the standing requirement to [473 U.S. 479, 513]  which the ABA referred and, in fact, had not been articulated at the time of the ABA comments.


At the same time, courts that believe civil RICO doctrine should mirror civil antitrust doctrine also read too much into the legislative history. It is absolutely clear that Congress intended to adopt antitrust

remedies, such as civil actions by the Government and treble damages. The House of Representatives added the civil provision to Title IX in response to suggestions from the ABA and Congressmen that there be a remedy "similar to the private damage remedy found in the anti-trust laws," Organized Crime Control: Hearings on S. 30 and Related Proposals, before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 520 (1970) (statement of Rep. Steiger) (hereinafter House Hearings); see also id., at 543 (statement of Edward L. Wright, ABA president-elect) (suggesting an amendment "to include the additional civil remedy of authorizing private damage suits based upon the concept of Section 4 of the Clayton (Antitrust) Act"); 116 Cong. Rec. 35295 (1970) (remarks of Rep. Poff, chief spokesman for the bill) (explaining bill's adoption of the antitrust remedy for use against organized crime). The decision to adopt antitrust remedies does not, however, compel the conclusion that Congress intended to adopt substantive antitrust doctrine. Courts that construe these references to the antitrust laws as indications of Congress' intent to adopt the substance of antitrust doctrine also read too much into too little language.

C

While the foregoing establishes that Congress sought to adopt remedies akin to those used in antitrust law - such as civil government enforcement - and to reject antitrust standing rules, other portions of the legislative history reveal just what Congress intended the substantive dimensions of the civil action to be. Quite simply, its principal target was the economic power of racketeers, and its toll on legitimate businessmen. [473 U.S. 479, 514]  To this end, Congress sought to fill a gap in the civil and criminal laws and to provide new remedies broader than those already available to private or government antitrust plaintiffs, different from those available to government and private citizens under state and federal laws, and significantly narrower than those adopted by the Court today.

In 1967, Senator Hruska proposed two bills, S. 2048 and S. 2049, 90th Cong., 1st Sess., which were designed in part to implement recommendations of the President's Commission on Law Enforcement and the Administration of Justice (the Katzenbach Commission) on the fight against organized crime. See 113 Cong. Rec. 17998-18001 (1967). The former bill proposed an amendment to the Sherman Act prohibiting the investment or use of unreported income derived from one line of business in another business. Id., at 17999. The latter bill, which was separate from the Sherman Act, prohibited the acquisition of a business interest with income derived from criminal activity. Ibid. Representative Poff introduced similar bills in the House of Representatives. See H. R. 11266, H. R. 11268, 90th Cong., 1st ess. (1967); 113 Cong. Rec. 17976 (1967).

Introducing S. 2048, Senator Hruska explained that "[b]y limiting its application to intentionally unreported income, this proposal highlights the fact that the evil to be curbed is the unfair competitive advantage inherent in the large amount of illicit income available to organized crime." Id., at 17999 (emphasis added). He described how organized crime had infiltrated a wide range of businesses, and he observed that "[i]n each of these instances, large amounts of cash coupled with threats of violence, extortion, and similar techniques were utilized by mobsters to achieve their desired objectives: monopoly control of these enterprises." Id., at 17998 (emphasis added). He identified four means by which control of legitimate business had been acquired:

"First. Investing concealed profits acquired from gambling and other illegal enterprises. [473 U.S. 479, 515]

"Second. Accepting business interests in payment of the owner's gambling debts.

"Third. Foreclosing on usurious loans.

"Fourth. Using various forms of extortion." Id., at 17998-17999.

The Senator then explained how this infiltration takes its toll:

"The proper functioning of a free economy requires that economic decisions be made by persons free to exercise their own judgment. Force or fear limits choice, ultimately reduces quality, and increases prices. When organized crime moves into a business, it brings all the techniques of violence and intimidation which it used in its illegal businesses. Competitors are eliminated and customers confined to sponsored suppliers. Its effect is even more unwholesome than other monopolies because its position does not rest on economic superiority." Id., at 17999.

Congress never took action on these bills.

In 1969, Senator McClellan introduced the Organized Crime Control Act, which altered numerous criminal law areas such as grand juries, immunity, and sentencing, but which contained no provision like that now known as RICO. See S. 30, 91st Cong., 1st Sess.; 115 Cong. Rec. 769 (1969). Shortly thereafter, Senator Hruska introduced the Criminal Activities Profits Act. S. 1623, 91st Cong., 1st Sess.; 115 Cong. Rec. 6995-6996 (1969). He explained that S. 1623 was designed to synthesize the earlier two bills (S. 2048 and S. 2049) while placing the "unified whole" outside the Sherman Act in response to the ABA's concerns. According to the Senator, the bill was meant to attack "the economic power of organized crime and its exercise of unfair competition with honest businessmen," and to address "[t]he power of organized crime to establish a monopoly within numerous business fields" and the impact on the free market and honest [473 U.S. 479, 516]  competitors of "a racketeer dominated venture." Id., at 6993 (emphasis added).

Is introduced, S. 1623 contained a provision for a private treble-damages action; the language of that provision was virtually identical to that in 1964(c), and it likely served as the model for 1964(c). See id., at 6996. Explaining this provision, Senator Hruska said:

"In addition to this criminal prohibition, the bill also creates civil remedies for the honest businessman who has been damaged by unfair competition from the racketeer businessman. Despite the willingness of the courts to apply the Sherman Anti-Trust Act to organized crime activities, as a practical matter the legitimate businessman does not have adequate civil remedies available under that act. This bill fills that gap." Id., at 6993 (emphasis added).

The Senate did not act directly on either S. 30 or S. 1623. Instead, Senators McClellan and Hruska jointly introduced S. 1861, the Corrupt Organizations Act of 1969, 91st Cong., 1st Sess.; 115 Cong. Rec. 9568-9571, which combined features of the two other bills and added to them. The new bill expanded the list of offenses that would constitute "racketeering activity" and required that the proscribed conduct be committed through a pattern of "racketeering activity." It did not, however, contain a private civil remedy provision, but only authorization for an injunctive action brought by the Attorney General. Senator McClellan thereafter requested that the provisions of S. 1861 be incorporated by amendment into the broad Organized Crime Control Act, S. 30. See 115 Cong. Rec. 9566-9571 (1969).

In December 1969, the Senate Judiciary Committee reported on the Organized Crime Control Act, S. 30, as amended to include S. 1861 as Title IX, "Racketeer Influenced and Corrupt Organizations." Title IX, it is clear, was [473 U.S. 479, 517]  aimed at precisely the same evil that Senator Hruska had targeted in 1967 - the infiltration of legitimate business by organized crime. According to the Committee Report, the Title

"has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce. It seeks to achieve this objective by the fashioning of new criminal and civil remedies and investigative procedures." S. Rep. No.

91-617, p. 76 (1969).

In language taken virtually verbatim from the earlier floor statements of Senator Hruska, the Report described the extraordinary range of legitimate businesses and unions that had been infiltrated by racketeers, and the means by which the racketeers sought to profit from the infiltration. It described "scams" involving bankruptcy and insurance fraud, and the use of "force or fear" to secure a monopoly in the service or product of the business, and it summed up: "When the campaign is successful, the organization begins to extract a premium price from customers." Id., at 77.

Similarly, Senator Byrd spoke in favor of Title IX and gave other examples of the "awesome power" of racketeers and their methods of operation. He described, for example, how one racketeer had gained a foothold in a detergent company and then had used arson and murder to try to get the A & P Tea Co. to buy a detergent that A & P had tested and rejected. 116 Cong. Rec. 607 (1970). As another example, he explained that racketeers would corner the market on a good or service and then withhold it from a businessman until he surrendered his business or made some other related economic concession. Ibid. In each of these cases, I note, the racketeer engaged in criminal acts in order to accomplish a commercial goal - e. g., to destroy competition, create a monopoly, or infiltrate a legitimate business. See also id., at 602 (statement of Sen. Hruska) ("[Organized crime] employs [473 U.S. 479, 518]  physical brutality, fear and corruption to intimidate competitors and customers to achieve increased sales and profits") (emphasis added). In sum, "[s]crutiny of the Senate Report . . . establishes without a doubt a single dominating purpose of the Senate in proposing the RICO statute: "Title IX represents the committee's careful efforts to fashion new remedies to deal with the infiltration of organized crime into legitimate organizations operating in interstate commerce."" ABA Report 105.

The bill passed the Senate after a short debate by a vote of 73 to 1, without a treble-damages provision, and it was then considered by the House. In hearings before the House Judiciary Committee, it was suggested that the bill should include "the additional civil remedy of authorizing private damage suits based upon the concept of Section 4 of the Clayton Act." House Hearings, at 543-544 (statement of Edward Wright, ABA president-elect); see also id., at 520 (statement of Rep. Steiger) (suggesting addition of a private civil damages remedy). Before reporting the bill favorably in September 1970, the House Judiciary Committee made one change to the civil remedy provision - it added a private treble-damages provision to the civil remedies already available to the Government; the Committee accorded this change only a single statement in the Committee Report: "The title, as amended, also authorizes civil treble damage suits on the part of private parties who are injured." H. R. Rep. No. 91-1549, p. 35 (1970). Three Congressmen dissented from the Report. Their views are particularly telling because, with language that is narrow compared to the extraordinary scope the civil provision has acquired, these three challenged the possible breadth and abuse of the private civil remedy by plaintiff-competitors:

> "Indeed, [ 1964(c)] provides invitation for disgruntled and malicious competitors to harass innocent businessmen [473 U.S. 479, 519]  engaged in interstate commerce by authorizing private damage suits. A competitor need only raise the claim that his rival has derived gains from two games of poker, and, because this title prohibits even the `indirect use' of such gains - a provision with tremendous outreach - litigation is begun. What a protracted, expensive trial may not succeed in doing, the adverse publicity may well accomplish - destruction of the rival's business." Id., at 187 (emphasis added).

The bill then returned to the Senate, which passed it without a conference, apparently to assure passage during the session. Thus, the private remedy at issue here slipped quietly into the statute, and its entrance evinces absolutely no intent to revolutionize the enforcement scheme, or to give undue

breadth to the broadly worded provisions - provisions Congress fully expected Government enforcers to narrow.

Putting together these various pieces, I can only conclude that Congress intended to give to businessmen who might otherwise have had no available remedy a possible way to recover damages for competitive injury, infiltration injury, or other economic injury resulting out of, but wholly distinct from, the predicate acts. Congress fully recognized that racketeers do not engage in predicate acts as ends in themselves; instead, racketeers threaten, burn, and murder in order to induce their victims to act in a way that accrues to the economic benefit of the racketeer, as by ceasing to compete, or agreeing to make certain purchases. Congress' concern was not for the direct victims of the racketeers' acts, whom state and federal laws already protected, but for the competitors and investors whose businesses and interests are harmed or destroyed by racketeers, or whose competitive positions decline because of infiltration in the relevant market. Its focus was on the victims of the extraordinary economic power that racketeers are able to acquire through a wide [473 U.S. 479, 520]  range of illicit methods. Indeed, that is why Congress provided for recovery only for injury to business or property - that is, commercial injuries - and not for personal physical or emotional injury.

The only way to give effect to Congress' concern is to require that plaintiffs plead and prove that they suffered RICO injury - injury to their competitive, investment, or other business interests resulting from the defendant's conduct of a business or infiltration of a business or a market, through a pattern of racketeering activity. As I shall demonstrate, this requirement is manageable, and it puts the statute to the use to which it was addressed. In addition, this requirement is faithful to the language of the statute, which does not appear to provide recovery for injuries incurred by reason of individual predicate acts. It also avoids most of the "extraordinary uses" to which the statute has been put, in which legitimate businesses that have engaged in two criminal acts have been labeled "racketeers," have faced treble-damages judgments in favor of the direct victims, and often have settled to avoid the destructive publicity and the resulting harm to reputation. These cases take their toll; their results distort the market by saddling legitimate businesses with uncalled-for punitive bills and undeserved labels. To allow punitive actions and significant damages for injury beyond that which the statute was intended to target is to achieve nothing the statute sought to achieve, and ironically to injure many of those lawful businesses that the statute sought to protect. Under such circumstances, I believe this Court is derelict in its failure to interpret the statute in keeping with the language and intent of Congress.

Several lower courts have remarked, however, that a "RICO injury" requirement, while perhaps contemplated by the statute, defies definition. I disagree. The following series of examples, culled in part from the legislative history of the RICO statute, illustrates precisely what does and does not fall within this definition. [473 U.S. 479, 521]

First. If a "racketeer" uses "[t]hreats, arson and assault . . . to force competitors out of business and obtain larger shares of the market," House Hearings, at 106 (statement of Sen. McClellan), the threats, arson, and assault represent the predicate acts. The pattern of those acts is designed to accomplish, and accomplishes, the goal of monopolization. Competitors thereby injured or forced out of business could allege "RICO" injury and recover damages for lost profits. So, too, purchasers of the racketeer's goods or services, who are forced to buy from the racketeer/monopolist at higher prices, and whose businesses therefore are injured, might recover damages for the excess costs of doing business. The direct targets of the predicate acts - whether competitors, suppliers, or others - could recover for damages flowing from the predicate acts themselves, but under state or perhaps other federal law, not RICO.

Second. If a "racketeer" uses arson and threats to induce honest businessmen to pay protection money, or to purchase certain goods, or to hire certain workers, the targeted businessmen could sue to recover for injury to their business and property resulting from the added costs. This would be so if they were the direct victims of the predicate acts or if they had reacted to offenses committed against other businessmen. In each case, the predicate acts were committed in order to accomplish a certain end - e. g., to induce the prospective plaintiffs to take action to the economic benefit of the racketeer; in each case the result would have taken a toll on the competitive position of the prospective plaintiff by increasing his costs of doing business.

At the same time, the plaintiffs could not recover under RICO for the direct damages from the predicate acts. They could not, for example, recover for the cost of the building burned, or for personal injury resulting from the threat. Indeed, compensation for this latter injury is barred already by RICO's exclusion of personal injury claims. As in the previous [473 U.S. 479, 522] example, these injuries are amply protected by state-law damages actions.

Third. If a "racketeer" infiltrates and obtains control of a legitimate business either through fraud, foreclosure on usurious loans, extortion, or acceptance of business interests in payment of gambling debts, the honest investor who is thereby displaced could bring a civil RICO action claiming infiltration injury resulting from the infiltrator's pattern of predicate acts that enabled him to gain control. Thereafter, if the enterprise conducts its business through a pattern of racketeering activity to enhance its profits or perpetuate its economic power, competitors of that enterprise could bring civil RICO actions alleging injury by reason of the enhanced commercial position the enterprise has obtained from its unlawful acts, and customers forced to purchase from sponsored suppliers could recover their added costs of doing business. At the same time, the direct victims of the activity - for example, customers defrauded by an infiltrated bank - could not recover under civil RICO. The bank does not, of course, thereby escape liability. The customers simply must rely on the existing causes of action, usually under state law.

Alternatively, if the infiltrated enterprise operates a legitimate business to a businessman's competitive disadvantage because of the enterprise's strong economic base derived from perpetration of predicate acts, the competitor could bring a civil RICO action alleging injury to his competitive position. The predicate acts then would have enabled the "enterprise" to gain a competitive advantage that brought harm to the plaintiff-competitor. Again, the direct victims of the predicate acts whose profits were invested in the "legitimate enterprise," would not be able to recover damages under civil RICO for injury resulting from the predicate acts alone.

These examples are not exclusive, and if this formulation were adopted, lower courts would, of course, have the opportunity [473 U.S. 479, 523] to smooth numerous rough edges. The examples are designed simply to illustrate the type of injury that civil RICO was, to my mind, designed to compensate. The construction I describe offers a powerful remedy to the honest businessmen with whom Congress was concerned, who might have had no recourse against a "racketeer" prior to enactment of the statute. At the same time, this construction avoids both the theoretical and practical problems outlined in Part I. Under this view, traditional state-law claims are not federalized; federal remedial schemes are not inevitably displaced or superseded; and, consequently, ordinary commercial disputes are not misguidedly placed within the scope of civil RICO. 2

### III

The Court today permits two civil actions for treble damages to go forward that are not authorized either by the language and legislative history of the civil RICO statute, or by the policies that underlay

passage of that statute. In so doing, the Court shirks its well-recognized responsibility to assure that Congress' intent is not thwarted by maintenance of unintended litigation, and it does so based on an unfounded and ill-considered reading of a statutory provision. Because I believe the provision at issue is susceptible of a narrower interpretation that comports both with the statutory language and the legislative history, I dissent.

[ Footnote * ] [This opinion applies also to No. 84-822, American National Bank & Trust Company of Chicago et al. v. Haroco, Inc., et al, post, p. 606.]

[ Footnote 1 ] Section 1964(c) provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Section 4 of the Clayton Act, 15 U.S.C. 15, provides in relevant part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[ Footnote 2 ] The analysis in my dissent would lead to the dismissal of the civil RICO claims at stake here. I thus do not need to decide whether a civil RICO action can proceed only after a criminal conviction. See ante, at 488-493.

JUSTICE POWELL, dissenting.

I agree with JUSTICE MARSHALL that the Court today reads the civil RICO statute in a way that validates uses of the statute that were never intended by Congress, and I join his dissent. I write separately to emphasize my disagreement [473 U.S. 479, 524] with the Court's conclusion that the statute must be applied to authorize the types of private civil actions now being brought frequently against respected businesses to redress ordinary fraud and breach-of-contract cases. 1

# I

In United States v. Turkette, 452 U.S. 576 (1981), the Court noted that in construing the scope of a statute, its language, if unambiguous, must be regarded as conclusive "in the absence of 'a clearly expressed legislative intent to the contrary.'" Id., at 580 (emphasis added) (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)). Accord, Russello v. United States, 464 U.S. 16, 20 (1983). In both Turkette and Russello, we found that the "declared purpose" of Congress in enacting the RICO statute was "'to seek the eradication of organized crime in the United States.'" United States v. Turkette, supra, at 589 (quoting the statement of findings prefacing the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 923); accord, Russello v. United States, supra, at 26-27. That organized crime was Congress' target is apparent from the Act's title, is made plain throughout the legislative history of the statute, see, e. g., S. Rep. No. 91-617, p. 76 (1969) (S. Rep.), and is acknowledged by all parties to these two cases. Accord, Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 70-92 (1985) (ABA Report). The legislative history cited by the Court today amply supports this conclusion, see ante, at 487-488, and the Court concedes that "in its private civil version, RICO is evolving into something quite [473 U.S. 479, 525] different from the original conception of its enactors. See generally ABA Report 55-69." Ante, at 500. Yet, the Court concludes that it is compelled by the statutory language to construe 1964(c) to reach garden-variety fraud and breach of contract cases such as those before us today. Ibid.

As the Court of Appeals observed in this case, "[i]f Congress had intended to provide a federal forum for plaintiffs for so many common law wrongs, it would at least have discussed it." 2 741 F.2d 482, 492 (1984). The Court today concludes that Congress was aware of the broad scope of the statute, relying on the fact that some Congressmen objected to the possibility of abuse of the RICO statute by arguing that it could be used "to harass innocent businessmen." H. R. Rep. No. 91-1549, p. 187 (1970) (dissenting views of Reps. Conyers, Mikva, and Ryan); 116 Cong. Rec. 35342 (1970) (remarks of Rep. Mikva).

In the legislative history of every statute, one may find critics of the bill who predict dire consequences in the event of its enactment. A court need not infer from such statements by opponents that Congress intended those consequences to occur, particularly where, as here, there is compelling evidence to the contrary. The legislative history reveals that Congress did not state explicitly that the statute would reach only members of the Mafia because it believed there were constitutional problems with establishing such a specific status offense. E. g., id., at 35343-35344 (remarks of Rep. Celler); id., at 35344 (remarks of Rep. Poff). Nonetheless, the legislative history makes clear that the statute was intended to be applied to organized crime, and an influential sponsor of the bill emphasized that any effect it had beyond such crime was meant to be only incidental. Id., at 18914 (remarks of Sen. McClellan). [473 U.S. 479, 526]

The ABA study concurs in this view. The ABA Report states:

> "In an attempt to ensure the constitutionality of the statute, Congress made the central proscription of the statute the use of a `pattern of racketeering activities' in connection with an `enterprise,' rather than merely outlawing membership in the Mafia, La Cosa Nostra, or other organized criminal syndicates. `Racketeering' was defined to embrace a potpourri of federal and state criminal offenses deemed to be the type of criminal activities frequently engaged in by mobsters, racketeers and other traditional members of `organized crime.' The `pattern' element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes. The `enterprise' element, when coupled with the `pattern' requirement, was intended by the Congress to keep the reach of RICO focused directly on traditional organized crime and comparable ongoing criminal activities carried out in a structured, organized environment. The reach of the statute beyond traditional mobster and racketeer activity and comparable ongoing structured criminal enterprises, was intended to be incidental, and only to the extent necessary to maintain the constitutionality of a statute aimed primarily at organized crime." Id., at 71-72 (footnote omitted).

It has turned out in this case that the naysayers' dire predictions have come true. As the Court notes, ante, at 499, and n. 16, RICO has been interpreted so broadly that it has been used more often against respected businesses with no ties to organized crime, than against the mobsters who were the clearly intended target of the statute. While I acknowledge that the language of the statute may be read as broadly as the Court interprets it today, I do not believe that it must [473 U.S. 479, 527] be so read. Nor do I believe that interpreting the statutory language more narrowly than the Court does will "eliminate the [civil RICO] private action," ante, at 499, in cases of the kind clearly identified by the legislative history. The statute may and should be read narrowly to confine its reach to the type of conduct Congress had in mind. It is the duty of this Court to implement the unequivocal intention of Congress.

## II

The language of this complex statute is susceptible of being read consistently with this intent. For example, the requirement in the statute of proof of a "pattern" of racketeering activity may be interpreted narrowly. Section 1961(5), defining "pattern of racketeering activity," states that such a pattern "requires at least two acts of racketeering activity." This contrasts with the definition of "racketeering activity" in 1961(1), stating that such activity "means" any of a number of acts. The definition of "pattern" may thus logically be interpreted as meaning that the presence of the predicate acts is only the beginning: something more is required for a "pattern" to be proved. The ABA Report concurs in this view. It argues persuasively that "[t]he `pattern' element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes," ABA Report 72, such as the criminal acts alleged in the case before us today.

The legislative history bears out this interpretation of "pattern." Senator McClellan, a leading sponsor of the bill, stated that "proof of two acts of racketeering activity, without more, does not establish a pattern." 116 Cong. Rec. 18940 (1970). Likewise, the Senate Report considered the "concept of `pattern' [to be] essential to the operation of the statute." S. Rep., at 158. It stated that the bill was not aimed at sporadic activity, but that the "infiltration of legitimate business normally requires more than one `racketeering [473 U.S. 479, 528]  activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." Ibid. (emphasis added). The ABA Report suggests that to effectuate this legislative intent, "pattern" should be interpreted as requiring that (i) the racketeering acts be related to each other, (ii) they be part of some common scheme, and (iii) some sort of continuity between the acts or a threat of continuing criminal activity must be shown. ABA Report, at 193-208. By construing "pattern" to focus on the manner in which the crime was perpetrated, courts could go a long way toward limiting the reach of the statute to its intended target - organized crime.

The Court concedes that "pattern" could be narrowly construed, ante, at 496, n. 14, and notes that part of the reason civil RICO has been put to such extraordinary uses is because of the "failure of Congress and the courts to develop a meaningful concept of `pattern,'" ante, at 500. The Court declines to decide whether the defendants' acts constitute such a pattern in this case, however, because it concludes that that question is not before the Court. Ibid. I agree that the scope of the "pattern" requirement is not included in the questions on which we granted certiorari. I am concerned, however, that in the course of rejecting the Court of Appeals' ruling that the statute requires proof of a "racketeering injury" the Court has read the entire statute so broadly that it will be difficult, if not impossible, for courts to adopt a reading of "pattern" that will conform to the intention of Congress.

The Court bases its rejection of the "racketeering injury" requirement on the general principles that the RICO statute is to be read "broadly," that it is to be "`liberally construed to effectuate its remedial purposes,'" ante, at 498 (quoting Pub. L. 91-452, 904(a), 84 Stat. 947), and that the statute was part of "an aggressive initiative to supplement old remedies and develop new methods for fighting crime." Ante, at 498. Although the Court acknowledges that few of the legislative statements supporting these principles were made [473 U.S. 479, 529]  with reference to RICO's private civil action, it concludes nevertheless that all of the Act's provisions should be read in the "spirit" of these principles. Ibid. By constructing such a broad premise for its rejection of the "racketeering injury" requirement, the Court seems to mandate that all future courts read the entire statute broadly.

It is neither necessary to the Court's decision, nor in my view correct, to read the civil RICO provisions so expansively. We ruled in Turkette and Russello that the statute must be read broadly and construed liberally to effectuate its remedial purposes, but like the legislative history to which the Court alludes, it is clear we were referring there to RICO's criminal provisions. It does not necessarily follow that the same principles apply to RICO's private civil provisions. The Senate Report recognized a difference between criminal and civil enforcement in describing proposed civil remedies that would have been available to the Government. It emphasized that although those proposed remedies were intended to place additional pressure on organized crime, they were intended to reach "essentially an economic, not a punitive goal." S. Rep., at 81 (emphasis added). The Report elaborated as follows:

> "However remedies may be fashioned, it is necessary to free the channels of commerce from predatory activities, but there is no intent to visit punishment on any individual; the purpose is civil. Punishment as such is limited to the criminal remedies . . . ." Ibid. (emphasis added; footnote omitted).

The reference in the Report to "predatory activities" was to organized crime. Only a small fraction of the scores of civil RICO cases now being brought implicate organized crime in any way. 3 Typically, these suits are being brought - in the [473 U.S. 479, 530]  unfettered discretion of private litigants - in federal court against legitimate businesses seeking treble damages in ordinary fraud and contract cases. There is nothing comparable in those cases to the restraint on the institution of criminal suits exercised by Government prosecutorial discretion. Today's opinion inevitably will encourage continued expansion of resort to RICO in cases of alleged fraud or contract violation rather than to the traditional remedies available in state court. As the Court of Appeals emphasized, it defies rational belief, particularly in light of the legislative history, that Congress intended this far-reaching result. Accordingly, I dissent.

[ Footnote 1 ] The Court says these suits are not being brought against the "archetypal, intimidating mobster" because of a "defect" that is "inherent in the statute." Ante, at 499. If RICO must be construed as the Court holds, this is indeed a defect that Congress never intended. I do not believe that the statute must be construed in what in effect is an irrational manner.

[ Footnote 2 ] The force of this observation is accented by RICO's provision for treble damages - an enticing invitation to litigate these claims in federal courts.

[ Footnote 3 ] As noted in the ABA Report, of the 270 District Court RICO decisions prior to this year, only 3% (9 cases) were decided throughout the entire decade of the 1970's, whereas 43% (116 cases) were decided in 1984. ABA Report, at 53a (Table). See ante, at 481, n. 1. [473 U.S. 479, 531]

Enclosures, Mers document, the Assignment of Mortgage, Notaries place of Commission,

The Florida Federal Court Plan Of Confiramtion pertaining to Case No. 3:09-bk-7047 – JAF

Chapter 11, confirming Katina Duran is bound to the Confirmation Of the Plan of Liquidiation.

Meaning a Creditor.  The SEC VS Farkas Complaint. The County Auditors Appraisal, Notaries Commissioned in the State so sworn to, The Ohio Revised Code established rules of Jurisdiction for Powers of Notaries. Violations in  Code 147.03, and 147.14 of the Acts and entitled to relief thereof. Failure to administer the Oath or Affirmation Section 147.99 B, prescribes a fine of $100.00 or impr isonment for 30 days or both. Therefore every notary must administer the oath affirmation before he /she signs the seal of the documents.


        I will have no problem verifying my loan documents, and other personal documents

under privileged information-privacy for protections of further damages made unto myself.

when BAC provides my answers in my lawsuit, pertaining to payment history, and the servicing

agreement, as a well as a all records, and documents stated in my complaints, as they refuse to provide by the laws in my TILA disclosure. It is clear injury with undue hardship.



# LUCAS COUNTY COMMON PLEAS COURT
## CORNER ADAMS & ERIE STREETS
### TOLEDO, OHIO 43604
# SUMMONS
# CIVIL ACTION

**FILING TYPE:**             **FORECLOSURE**

JOHN DOE UNK SPOUSE IF ANY OF KATINA L      G-4801-CI-0201203667-000
DURAN                                     JUDGE: DEAN MANDROS
7346 HILL AVENUE
HOLLAND, OH 43528

        You have the right to seek legal counsel. If you cannot afford a lawyer, you may contact the Legal Services of Northwest Ohio. If you do not qualify for services by the Legal Services of Northwest Ohio and do not know an attorney you may contact the Toledo Bar Association's Lawyer Referral Service (419) 242-2000.

---

        You have been named as a defendant in a Complaint filed in this Court by the plaintiff named below. A copy of the Complaint is attached to this Summons.

        You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, a copy of an answer to the complaint, within twenty-eight (28) days after you receive this Summons, exclusive of the of the day of service or to an amended complaint within the remaining response time to the complaint or 14 days, whichever period may be longer. Your answer must be filed with the Clerk of Court of Common Pleas within three (3) days after the service of a copy of the Answer on the plaintiff's attorney.

        If you fail to serve and file your Answer, judgment by default will be rendered against you for the relief demanded in the Complaint.

PLAINTIFF (S)                                              ATTORNEY FOR PLAINTIFF(S)

BANK OF AMERICA NA                                  NICHOLAS J CARDINAL
SUCCESSOR BY MERGER TO BAC HOME            24755 CHAGRIN BLVD
LOANS SERVICING LP                                   STE 200
7105 CORPORATE DRIVE                           CLEVELAND, OH 44122-5690
PLANO, TX 75024

                                                  BERNIE QUILTER
                                                  CLERK OF COURTS

Date: June 07, 2012

                              *J. Bernice Quilter*               , Clerk

```
┌─────────────────────────────────────────────────────────┐
│   ARE YOU THE HOMEOWNER IN THIS CIVIL ACTION?             │
│      NEED HELP FROM A FREE LAWYER?                        │
│                                                           │
│              Call: 419-213-4731                           │
│                                                           │
│         INTERESTED IN MEDIATION?                          │
│                                                           │
│   Homeowner/complete and return the enclosed form         │
│                                                           │
│         HAVE OTHER QUESTIONS?                             │
│                                                           │
│   Visit www.savethedream.ohio.gov to obtain information   │
│   on actions you may take when you are facing foreclosure │
└─────────────────────────────────────────────────────────┘
```

G-4801-CI-0201203667-000    JOHN DOE UNK SPOUSE OF KATINA L DURAN   Generated: June 07, 2012

NOTICE REQUIRED BY THE
FAIR DEBT COLLECTION
PRACTICES ACT, (the Act),
15 U.S.C. Section 1692 As Amended

1.)      As of May 19, 2012, the amount owed is $236,026.79.  Because of interest, late charges, and other charges that

may vary from day to day, the amount due on the day you pay may be greater.  Hence, if you pay the amount shown above,

an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check

for collection.  For further information, write the law firm listed below or call (216) 360-7200.

2.)      Bank of America, N.A., Successor by Merger to BAC Home Loans Servicing, L.P., fka Countrywide Home Loans

Servicing, L.P. is the Creditor to whom the debt is owed.

3.)      The debt described herein will be assumed to be valid by the Creditor`s law firm, unless the debtor, within (30) thirty

days after the receipt of this notice, disputes, the validity of the debt or some portion thereof.   Please note that

notwithstanding the foregoing, you are still responsible under state law to file a response to the Complaint, to which this

Notice is attached, within twenty-eight (28) days.  This twenty-eight (28) day period and the thirty (30) day period mentioned

above both commence the day after you receive the Complaint.  If you are uncertain of your rights or obligations under this

Notice or the Complaint, or if you have any questions concerning the proceedings that have been commenced by the filing

of the Complaint, you should consult an Attorney of your choice.

4.)      If the debtor(s) notifies the Creditor`s law firm in writing within thirty (30) days of the receipt of this notice that the

debt or any portion thereof is disputed, the Creditor`s law firm will obtain a verification of the debt and a copy of the

verification will be mailed to the debtor(s) by the Creditor`s law firm.

5.)      If Bank of America, N.A., Successor by Merger to BAC Home Loans Servicing, L.P., fka Countrywide Home Loans

Servicing, L.P. is not the original creditor, and if the debtor(s) makes a written request to the creditor`s law firm within thirty

(30) days from the receipt of this notice, the name and address of the original creditor(s) will be mailed to the debtor by the

Creditor`s law firm.

6.)      Written requests should be addressed to Carlisle, McNellie, Rini, Kramer & Ulrich Co., L.P.A., 24755 Chagrin

Boulevard, Suite 200, Cleveland, Ohio 44122. ** This law firm is attempting to collect the debt on behalf of the creditor and

any information obtained will be used for that purpose.**

# NOTE    "Redacted"

FHA CASE NO.
"Redacted'"

December 24, 2007
[Date]

7346 Hill Ave
Holland, OH  43528
[Property Address]

**1.    PARTIES**

"Borrower" means each person signing at the end of this Note, and the person's successors and assigns. "Lender" means **Taylor, Bean & Whitaker Mortgage Corp.**

and its successors and assigns.

**2.    BORROWER'S PROMISE TO PAY; INTEREST**

In return for a loan received from Lender, Borrower promises to pay the principal sum of **One Hundred Seventy Six Thousand Four Hundred Seven and no/100** Dollars (U.S. **$176,407.00** ), plus interest, to the order of Lender. Interest will be charged on unpaid principal, from the date of disbursement of the loan proceeds by Lender, at the rate of **Six and One Half**

percent ( **6.5000**%) per year until the full amount of principal has been paid.

**3.    PROMISE TO PAY SECURED**

Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." The Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

**4.    MANNER OF PAYMENT**

(A)  Time

Borrower shall make a payment of principal and interest to Lender on the first day of each month beginning on **February 01, 2008** . Any principal and interest remaining on the first day of **January 2038** , will be due on that date, which is called the "Maturity Date."

(B)  Place

Payment shall be made at **Taylor, Bean & Whitaker Mortgage Corp., 1417 North Magnolia Ave, Ocala, FL 34475**

or at such other place as Lender may designate in writing by notice to Borrower.

(C)  Amount

Each monthly payment of principal and interest will be in the amount of U.S. **$1,115.01** This amount will be part of a larger monthly payment required by the Security Instrument, that shall be applied to principal, interest and other items in the order described in the Security Instrument.

MULTISTATE FHA FIXED RATE NOTE

ITEM 6432L1 (0609)

"Redacted"

6/96
GreatDocs™
(Page 1 of 3)



T6432_20071012.100000

20080103-0000343
Pages: 8    Fee: $78.00
01/03/2008 09:23:05 AM
T20080000476
Jeanine Perry
Lucas County Recorder MORT

After Recording Return To:
AAA LAND TITLE
11316 CLEVELAND AVENUE NW
UNIONTOWN            , OH        44685

[Space Above This Line For Recording Data]

# OPEN-END MORTGAGE

MIN "Redacted"

FHA CASE NO.
"Redacted"

THIS MORTGAGE ("Security Instrument") is given on **December 24, 2007**
The mortgagor is **Katina L Duran, *UNMARRIED***

                                                            ("Borrower"). This Security Instrument is given to
Mortgage Electronic Registration Systems, Inc. ("MERS"). MERS is a separate corporation that is acting solely as nominee
for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is
organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI
48501-2026, tel. (888) 679-MERS. **Taylor, Bean & Whitaker Mortgage Corp.**

                                                            ("Lender") is organized and existing
under the laws of **FL**                                                                        , and
has an address of **1417 North Magnolia Ave, Ocala, FL 34475**

Borrower owes Lender the principal sum of **One Hundred Seventy Six Thousand Four Hundred Seven and no/100**
                                    Dollars (U.S. **$ 176,407.00**                  ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on **January 01, 2038**
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all
renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under
paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the
following described property located in **Lucas**
                                                            County, Ohio:

**OHIO FHA MORTGAGE**                                                        6/96

MERS
ITEM T9600L1 (0709)                                          GreatDocs™
                                                            (Page 1 of 7)

"Redacted"

T9690_20071128.100000

*K. L. D.*



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 3 of this Note.

_____ (Seal)                          _____ (Seal)
Katina L Duran                              -Borrower                                                                -Borrower


_____ (Seal)                          _____ (Seal)
                                                 -Borrower                                                                -Borrower


_____ (Seal)                          _____ (Seal)
                                                 -Borrower                                                                -Borrower

_____
                                                                                              [Sign Original Only]


Without recourse, pay to the order of

By: Taylor, Bean & Whitaker
        Mortgage Corp.

_____
Erla Carter-Shaw, E.V.P.

MULTISTATE FHA FIXED RATE NOTE

SIGNED AND ACKNOWLEDGED IN THE PRESENCE OF:

(MERS) Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Taylor, bean & Whitaker Mortgage Corp.

BY _____

ITS   Serena Harman-Assist. Vice President
    _____

STATE OF **TEXAS**        )
                                               )SS.
COUNTY   Dallas          )

    Before me, a Notary Public in and for the aforesaid County and State, personally appeared the above named _____Serena Harman_____, to me known to be the person who executed the foregoing instrument, who being duly sworn, did say that he/she is the ___ASSISTANT VICE PRESIDENT___ of (MERS) Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Taylor, bean & Whitaker Mortgage Corp., duly authorized to execute this Assignment of Mortgage, and acknowledged that he/she signed the said Assignment of Mortgage as said _____Serena Harman_____ on behalf of (MERS) Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Taylor, bean & Whitaker Mortgage Corp., and that the signing of said instrument is a free act and deed of said Corporation and the free act and deed of the said _____Serena Harman_____.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at ___, **Texas** this ____ day of _____, 20__.

**SEE ENV.**
This instrument prepared by,
and upon recording, return to:
JEFFREY V. LAURITO, L.L.C.
35 Commercial Way
Springboro, OH 45066
937-743-4878

_____
Notary Public

TERESA L. BESE
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-05-11

20100331-0012548
Pages: 4        Fee: $48.00
03/31/2010 08:57:44 AM
T20100009343
Jeanine Perry
Lucas County Recorder ASSIG

ASSIGNMENT OF MORTGAGE

**KNOW ALL MEN BY THESE PRESENT,** that (MERS) Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Taylor, bean & Whitaker Mortgage Corp., P.O. Box 2026, Flint, MI 48501-2026 for the consideration of One and 00/100 Dollars ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, does hereby sell, assign, transfer, and set over unto:

BAC Home Loans Servicing, LP fka
Countrywide Home Loans Servicing, L.P.
400 Countrywide Way
Simi Valley, CA 93065

Its successors and assigns, a certain mortgage deed, executed and delivered to (MERS) Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Taylor, bean & Whitaker Mortgage Corp., from Katina L. Duran, unmarried, in the amount of $176,407.00 recorded on January 3rd, 2008, in Instrument No. 20080103-0000343 in the office of the Recorder, Lucas County, Ohio, together with the Promissory Note secured thereby and referred to therein; and all sums of money due and to become due thereon. Said real estate described as follows:

SEE LEGAL DESCRIPTION EXHIBIT "A" ATTACHED HERETO AND MADE PART OF.

PPN: 65-01067

IN WITNESS WHEREOF, I have hereunto set my hand on this _____ day of _____ , 20___.



Home Page | Members Only | Contact Us | Location | Privacy Policy | Site Map

**Newsroom** | **About Us** | **Events** | **Why MERS?** | **Knowledge Base** | **Careers**

**Tools & Services**

MERS Products ›

| | MERS® System | MERS® Link | MERS® 1-2-3 | MERS® Commercial |
| | MERS® eRegistry | MERS® eDelivery | MERS® ServicerID | MERS Fraud Tools |
| | Mass.Gov Div. of Banks | MISMO® | | |

Downloads

Member Directory

Foreclosures

Enhancements

Forum

Advertising

Payment Options

**Information for Homeowners**

**Property Preservation Contacts**

📞 **Contact Us**



Home » Foreclosures

### FORECLOSURE & BANKRUPTCY

MERS® System Membership Rule 8 prohibits Members from initiating foreclosure proceedings in the name of Mortgage Electronic Registration Systems, Inc. ("MERS"). Rule 8 provides the required guidelines that must be followed when a mortgage in which MERS is the mortgagee will be foreclosed. Please click here to access the Rules of Membership, and reference the Rule 8 requirements.

Rule 8 requires a Member to instruct one of its MERS Signing Officers (also referred to as MERS Certifying Officers) to execute an assignment of the mortgage lien from MERS to the servicer or a third party selected by the Member. The assignment must be executed by the MERS Signing Officer prior to the initiation of the foreclosure proceeding. After executing the assignment, the Member must ensure that it is promptly sent for recording in the local land records as required by Rule 8.

These requirements also apply to Motions for Relief from Stay and Proofs of Claim in bankruptcy proceedings. Any time that a Member needs to file a Proof of Claim or Motion for Relief from Stay and MERS is the mortgagee, the Member must first instruct one of their MERS Signing Officers to execute an assignment of the mortgage lien from MERS to the servicer or a third party selected by the Member. As in foreclosure proceedings, the assignment must be executed prior to filing the document with the bankruptcy court, and the assignment should be promptly sent for recording.

The MERS Quarterly Case Law Outline is a comprehensive compilation of cases that address the foreclosure of a MERS mortgage and other legal issues that may arise during the foreclosure process. Additionally, the Monthly Litigation Digest outlines more recent cases and may also provide Members with guidance in these matters.

TOP

Home Page | Members Only | Contact Us | Location | Privacy Policy | Site Map

Copyright© 2012 by MERSCORP Holdings, Inc. 1-800-646-MERS (6377)
Other products or company names are or may be trademarks or registered trademarks and are the property of their respective holders.

*G*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

TAYLOR, BEAN & WHITAKER
MORTGAGE CORPORATION,

     Debtor.

CASE NO.: 3:09-bk-7047-JAF
Chapter 11

_____/

KATINA DURAN,

     Plaintiff,

v.

Adversary No.: 3:12-ap-367-JAF

TAYLOR, BEAN & WHITAKER
MORTGAGE CORPORATION,

     Defendant.

_____/

## ORDER OF DISMISSAL

     This proceeding is before the Court on Plaintiff Katina Duran's ("Plaintiff") complaint and demand for jury trial (Doc. 1, "Complaint"). Also before the Court is Defendant Taylor, Bean & Whitaker Plan Trust's, as successor to Taylor, Bean & Whitaker Mortgage Corporation (collectively, "Defendant"), Motion to Quash Service of the Complaint (Doc. 8, "Motion to Quash"). For the reasons provided herein, the Complaint is dismissed with prejudice and the Motion to Quash is deemed moot.[1]

     By way of background, in relation to the Debtor's case, Plaintiff, along with several other individuals, initiated a previous adversary proceeding by filing, *pro se*, a purported class action complaint (3:11-ap-326-JAF [Doc. 1]). In dismissing this adversary proceeding with prejudice, the

---

[1] The Court would note that the Complaint is largely incomprehensible (*see* Doc. 1). In addition, Plaintiff has not filed a response to Defendant's Motion to Quash, and the time for doing so has expired.

Court reminded the plaintiffs that they were enjoined from bringing, or continuing, any action by the express provisions of the Confirmed Plan of Liquidation (3:11-ap-326-JAF [Doc. 86 at 2]; *see also*, 3:09-bk-7047-JAF [Doc. 3420 at 30-32, Confirmed Plan of Liquidation]).  Consequently, the Order dismissing the action provided that the plaintiffs (which included Plaintiff Katina Duran) were foreclosed from bringing any more actions against Defendant (3:11-ap-326-JAF [Doc. 86 at 2; Doc. 97]).

The Court additionally noted that the Confirmed Plan of Liquidation, by which the plaintiffs (including Plaintiff Katina Duran) are bound, provides that any person (or entity) injured by any willful violation of the injunction, *supra*, may recover damages, including costs and attorneys' fees, and, in appropriate circumstances, may even recover punitive damages from the willful violator (3:09-bk-7047-JAF [Doc. 3420 at 31, ¶ 56]; 3:11-ap-326-JAF [Doc. 86 at 2; Doc. 97]).

Plaintiff filed the instant Complaint in derogation of the Court's prior orders, *supra*.  As such, the Complaint is due to be dismissed with prejudice.  The Court will again remind Plaintiff that she could be subject to sanctions for any willful violation of the express provisions of the Confirmed Plan of Liquidation (3:09-bk-7047-JAF [Doc. 3420 at 30-32]).

Based on the foregoing, it is **ORDERED**:

1.  Plaintiff's complaint and demand for jury trial (Doc. 1) is dismissed with prejudice.

2.  Defendant's Motion to Quash Service of the Complaint (Doc. 8) is deemed moot.

3.  The Status Conference, scheduled for July 31, 2012 at 10:00 a.m., is cancelled.

**DATED** this 11th day of July, 2012 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

2

021085    29409021106015

Erla Carter-Shaw
Compliance Officer at Five Brothers Default Management Solutions
Ocala Florida Area  Financial Services

Join LinkedIn and access Erla Carter-Shaw's full profile.

As a LinkedIn member, you'll join 150 million other professionals who are sharing connections, ideas, and opportunities. And it's free! You'll also be able to:

- See who you and Erla Carter-Shaw know in common
- Get introduced to Erla Carter-Shaw
- Contact Erla Carter-Shaw directly

## Erla Carter-Shaw's Overview

| | |
|---|---|
| Current | Compliance Officer at Five Brothers Default Management Solutions |
| Past | EVP/ Loan Administration & Post Closing at Taylor, Bean & Whitaker Mortgage Corp. |
| | Associate Director at hsbc bank usa |
| Education | American Institute of Banking |
| | New York University |
| | Pace University |
| Recommendations | 1 person has recommended Erla |
| Connections | 115 connections |
| Websites | Personal Website |

## Erla Carter-Shaw's Experience

**Compliance Officer**
**Five Brothers Default Management Solutions**
Privately Held; 51-200 employees; Financial Services industry
March 2010 – Present (2 years 5 months)

**EVP/ Loan Administration & Post Closing**
**Taylor, Bean & Whitaker Mortgage Corp.**
Privately Held; 1001-5000 employees; Financial Services industry
August 2000 – February 2010 (9 years 7 months)

Dynamic results driven Mortgage Banking Executive – highly motivated and skilled hands on leader with over 35 years of diverse industry experience with a strong track record of success. Creative and innovative with exceptional service mentality. Technically astute with extensive experience in system selection and implementation. Innovative problem solver, ability to see the business and technical sides of a problem. Proven ability to achieve optimum level of portfolio performance in loan servicing including collections, insurance, customer service, asset recovery, bankruptcy, etc. Possesses excellent communication, inter-personal and customer service skills. A strong history of successfully managing multiple operations within tight deadlines, making sound decisions, and meeting and/or exceeding customer expectations. Demonstrated experience developing and implementing cost and time-efficient processes and procedures and strengthening existing operations.
*Change Management *Employee Reviews and Evaluations *Information Technology
*Asset Management *Risk/Analysis/Management *Process Redesign *Quality Control
*Staff Enhancement *Workflow Optimization *Training/Development

**Associate Director**
**hsbc bank usa**
January 1969 – January 2000 (31 years 1 month)
Mortgage loan servicing organization with $9.7B portfolio of construction and home equity loans. Formerly known; Managed delinquency for $9.7B mortgage and home equity portfolio. Served as liaison between customers and regulatory agencies including Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation to develop foreclosure alternatives. Led and mentored 16 employees and constructed loans, payment processing and interest accrual. Directed restructuring of Servicing/Collection Department.
Slashed delinquency numbers and maintained <2% rate by motivating and training staff and redesigning servicing procedures.

## Erla Carter-Shaw's Education

**American Institute of Banking**

**New York University**

**Pace University**
Business Adm.
MBA Courses
• Introduction Residential Mortgage Loan Administration
• Collections Operations and Procedures
• FHLMC and FNMA Seminars related to Loss Mitigation
• Various FHA seminars
• Various MBA Seminars
Advanced Certification in Banking, American Institute of Banking
AS Business Administration, Pace University
SCP Certified, FHLMC Default Management
*Activities and Societies:* Writing Committee Banking Committee

## Erla Carter-Shaw's Additional Information

| | |
|---|---|
| Websites: | • Personal Website |
| Groups and Associations: | March of Dimes |
| | Default Servicing Vendor Management Professionals |

# TEXAS SECRETARY of STATE
# HOPE ANDRADE

**Notary Search**

**Notary Identification Number**

| First Name | Middle | Last Name | Suffix |
|---|---|---|---|
| teresa | l | bese | |

**Zip Code**

**County**

Start Over

**Found: 1  Displayed: 1**

Name: **Teresa L. Bese** - ID: **126027404**

| | |
|---|---|
| Address: | **2101 Brabant Dr**<br>**Plano, Tx 75025-0000** |
| Expires: | **Apr 01, 2015** |
| County: | **Collin** |
| Agency: | **Mark Master Inc** |
| Surety Company: | **Western Surety Company** |

| History | As | Effective | Expire Date |
|---|---|---|---|
| Commissioned Notary Public | Teresa L. Bese | 04/01/2011 | 04/01/2015 |
| Commissioned Notary Public | Teresa L. Bese | 03/05/2007 | 03/05/2011 |



Lucas County Auditor
Real Estate Division
One Government Center, Ste. 670
Toledo, OH 43604-2255

| IMPORTANT REAL ESTATE NOTICE FOR: | | |
|---|---|---|
| Address | 7346 Hill Ave | |
| Parcel # | 65-01067 | Assessor # 28-012-040.Z |

*********AUTO**5-DIGIT 43528        16  16

Katina L Duran
7346 Hill Ave
Holland, OH 43528-9534



Exhibit H



Your Property Value Online
www.co.lucas.oh.us/tri09

# 2009 NOTICE OF CHANGE IN VALUE

## THIS IS NOT A TAX BILL

The 2009 Value Update estimated market value of your real estate has been changed as follows:

| OLD MARKET VALUE | NEW MARKET VALUE |
|---|---|
| $130,900 | $113,900 |

| Building Attributes | | | |
|---|---|---|---|
| Total Living Area | 1264 | Year Built | 1941 |
| Rooms | 6 | Bedrooms | 3 |
| Full Baths | 1 | Half Baths | 0 |
| Stories | Two | Basement Type | Bsmtcrwl |
| Fireplace | 0 | Wall | Metlvnyl |

| A/C | No | Deck | 128 |
|---|---|---|---|
| Open Porch | 0 | Enclosed Porch | 144 |
| Garage Sq. Ft. | 440 | Garage Type | Detached |

| Land Attributes | | | |
|---|---|---|---|
| Lot Size | 88300 | Frontage | 132 |
| Water | City | Sewer | City |

## IT'S EASY TO CHECK YOUR DATA AND VALUE

Your property data and value are listed above. Please check to make sure the information we have listed for your property is correct. This will ensure an accurate fair market value for your property. The following additional options are available for you to check your information:

1. At your convenience, check your information in this notice or online at *www.co.lucas.oh.us/tri09*.

2. To review your information in-person, attend an *optional* property review meeting. We will be in your area at the dates and times listed to the right. You are encouraged to call (419) 213-4406 to schedule an appointment.

3. If you believe your information is incorrect, please follow the instructions outlined on the back of this page. You may also call our office at (419) 213-4406 to review your new value and data over the phone.

4. If you believe your information is correct, *you do not need to do anything.*

| Location |
|---|
| Springfield Township Hall |
| 7617 Angola Rd. |
| Holland OH 43528 |

| Date | Time |
|---|---|
| July 22 & 23 | 9:00 a.m. - 8:00 p.m. |

I Request a Jury Demand, or other relief this court deems is necessary, and request motion to show cause and move into discovery.


Katina Duran, pro'se

7346 Hill Ave.

Holland, Ohio 43528


I cerify all copies were furnished to Bank Of America N.A. And Bank Of America, LP Servicing,

and to Mcglinchey Stafford PLLC Attorney's for Defendant's.by regular mail with certified reciepts.

Copies to Teresa Bese, Serena Harman, Jeffrey Laurito, Nicholas Cardinal, Erla Carter Shaw, Mers

Corp by ordinary mail,and certified return reciepts.


    Respectfully Submitted,


    Katina L. Duran

    Dated August 6rd, 2012